**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 3:10-CV-157-VKA |
| Plaintiff, | : | |
| v. | : | |
| | : | MAGISTRATE JUDGE VERNELIS |
| ONE MILLION, THIRTY-TWO | : | K. ARMSTRONG |
| THOUSAND, NINE HUNDRED EIGHTY | | |
| DOLLARS IN U.S. CURRENCY | : | **MEMORANDUM  DECISION** |
| ($1,032,980.00) | | **AND ORDER** |
| | : | |
| Defendant. | | |
| | : | |

## I.      Jurisdiction

Jurisdiction is established under 28 U.S.C. § 1345 which provides that the district courts

shall have original jurisdiction over all civil actions, suits or proceedings commenced by the

United States.  The parties consented to the undersigned conducting all proceedings and entering

judgment pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73.

## II.      Introduction

This is a forfeiture action filed pursuant to the Drug Abuse Prevention and Control Act,

1

21 U.S.C. §§ 801 to 904.  Plaintiff, United States Government is seeking forfeiture of Defendant, $1,032,980.00.  Plaintiff asserts that Defendant property is proceeds from illegal drug trafficking activities and/or was used or intended to be used to facilitate illegal drug trafficking in violation of 21 U.S.C. § 841(a).  This Court has original jurisdiction under 28 U.S.C. § 1345.  This being an in rem forfeiture proceeding, this Court also has jurisdiction pursuant to 28 U. S. C. §1355 and 21 U.S.C. § 881.  Subject matter jurisdiction is established pursuant to 21 U.S.C. § 881 and 18 U.S.C. § 981.  Venue is proper pursuant to 28 U.S.C. § 1395.

### III.    Procedural History

On January 21, 2010 Plaintiff United States Government filed a Verified Complaint in Forfeiture against Defendant $1,033,000.00, asserting a cause of action, under 21 U.S.C. § 881, that Defendant was seized currency that had been used in,  had been intended to be used in, or constituted the proceeds from illegal drug trafficking activity[1]. (Docket No. 1).

On January 26, 2010, a Warrant of Arrest In Rem was issued ordering the U.S Marshals service to seize and detain in its custody Defendant $1,033,000.00 [hereinafter referred to as Defendant $1,032,980.00] and ordering that all persons claiming an interest in Defendant property shall file a claim of interest pursuant to 18 U.S.C. § 983 and Rule C of the Supplemental Rules for Certain Admiralty and Maritime Claims within 35 days of actual receipt or publication of the Warrant of Arrest in Rem.  (Docket No. 2).

On February 19, 2010, Claimant Anthony Vigna filed a Verified Claim Opposing

---

[1]    On November 27, 2011 Plaintiff filed United States' Motion to Amend Complaint and Subsequent Pleadings by Interlineation to Correct the Dollar Amount of the Seized Defendant Currency stating that the correct amount of the seized currency was $1,032,980.00. (Docket No. 27).  On November 30, 2010, this Court issued an Order granting Plaintiff's Motion to Amend Complaint.  (Docket No. 28).

Forfeiture claiming ownership and/or possessory interest in Defendant $1,032,980.00.  (Docket No. 6).  On February 24, 2010, Plaintiff filed a Declaration of Publication stating that a Notice of Civil Forfeiture had been posted on an official government internet site, www.forfeiture.gov, advising all parties of their right to file a petition regarding Defendant $1,032,980.00.  (Docket No. 7).  Subsequent to the filing by Plaintiff of the Declaration of Publication no other persons or entities have come forward claiming interest in or ownership of Defendant.

On June 11, 2010, Claimant filed an Answer of Claimant Anthony Vigna to Government's Complaint for Forfeiture In Rem with a demand for trial by jury.  (Docket No. 14).

On July 30, 2010, in accordance with 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73, District Judge Jack Zouhary issued an Order of Reference, pursuant to consent of parties, that this case be transferred to the undersigned for all further proceedings and entry of judgment.  (Docket No. 21).

On March 28, 2011, Claimant filed a Notice of Motion and Motion to Suppress Evidence, with attached Memorandum of Points and Authorities in Support.  (Docket No. 36).  On April 25, 2011, Plaintiff filed an Opposition to Claimant's Motion to Suppress.  (Docket No. 37).  On May 5, 2011, Claimant filed a Reply to Government's Opposition.  (Docket No. 38).

On August 12, 2011, a Hearing was held before this Court on Claimant's Motion to Suppress.  On September 12, 2011, a continuation of the Hearing of August 12, 2011 was held.

On December 1, 2011, Plaintiff filed a Post Hearing Brief in Opposition to Claimant's Motion to Suppress (Docket No. 53) and Claimant filed a Post Hearing Brief in Support of his Motion to Suppress. (Docket No. 54).

On January 11, 2012, counsel presented Closing Arguments as to Claimant's Motion to Suppress.

This cause is currently before this Court on Claimant's Motion to Suppress.

**Motion to Suppress and
the Exclusionary Rule**

The exclusionary rule operates to prevent use of evidence obtained either directly or indirectly by unlawful conduct.  Segura v. United States, 468 U.S. 796, 804 (1984).  This principal has become established as the "fruit of the poisonous tree" doctrine. Wong Su v.United States, 371 U.S. 471 (1963).  Thus, in accordance with the exclusionary rule, Claimant seeks suppression of certain evidence obtained following an allegedly illegal stop and subsequent warrantless searches and seizures as relates to Claimant's challenge to Plaintiff's forfeiture action against Defendant currency.

IV.     **Factual Background**

Set forth below is a narrative of facts and events relevant to the material issues of this case.

**A. Traffic Stop**

**1.  Prior to the stop**

During the mid to late morning of March 25, 2009, Ohio State Highway Patrol Trooper Alejo Romero and his partner Trooper Stacey Arnold were positioned in their vehicle at a highway crossover strip, near mile marker 58, on Interstate 80 (the Ohio Turnpike).  Trooper Romero was the driver of the trooper vehicle and Trooper Arnold was a passenger.  In the back seat of the trooper vehicle was K9 Hans, Trooper Romero's drug detection German Shepard. The weather conditions were wintery and blustery.

4

At approximately 10:54 - 10:55 a.m. the Troopers observed a black, 2003, Chevrolet Silverado pickup truck traveling in a westerly direction on the highway.  Troopers Romero and Arnold first observed the Silverado when it was east of them as it was traveling on the highway. Trooper Romero indicated that the Silverado appeared to slow down somewhat as it approached the highway crossover strip where the Troopers' vehicle was located.  The Silverado bore a Nevada license plate.

Thereupon, at approximately 10:55 to 10:56 a.m., Troopers Romero and Arnold made the decision to follow the Silverado.  The Troopers initiated their pursuit, approached the Silverado and followed the vehicle at a close, observing distance.

The Troopers identified the license plate number and ran a license plate check on the vehicle via the Mobile Computer Terminal (MCT) system and determined that the vehicle was owned by a Cory Steven Daiker of Reno, Nevada.  The Troopers noticed several features and characteristics of the Silverado as well as certain behaviors and actions of the driver and passenger of the vehicle.

The unique features or characteristics of the vehicle noticed by the Troopers included that there appeared to be no visible gap between the frame and the bed of the truck, there was the appearance of a new undercoating of paint in the wheel well on the driver's side of the vehicle and that the wheel well appeared to have been cleaned recently.   Also the spare tire, which was mounted on the underside, rear of the bed of the truck, appeared to be positioned unusually low.[2]

Trooper Romero also indicated that he observed the driver of the Silverado looking back

---

[2]   Trooper Romero had previously encountered two other vehicles, in 2001 and 2006, which, subsequently, were determined to have been outfitted with hidden compartments, which had altered or affected the outward appearance of those vehicles.

5

at the pursuing trooper vehicle in the driver's side mirror and that the driver appeared to be
nervous and agitated and that his behavior appeared to change upon noticing that he was being
followed by an OSHP vehicle.   He said that the passenger was also observed to look back on
several occasions at the pursuing trooper vehicle through the back window of the cab of the
truck.

Trooper Romero claimed that he and Trooper Arnold viewed the Silverado move, swerve
or veer onto or across the white line on the passenger side of the highway on three separate
occasions during the final, approximately forty-five seconds of their pursuit of the Silverado.

Trooper Romero stated that the first such move or swerve near to or across the right
white line, occurred for a brief moment while the Silverado was on an overpass.

The second such move or swerve occurred as the Silverado was proceeding through a
curve near mile marker 56 on the highway.  This swerve took place approximately one-eighth of
a mile after the first move or swerve was observed to have occurred.  This swerve may have
lasted a few moments longer than the first swerve and involved the Silverado going a bit further
astray than in the first swerve, as Trooper Romero claimed he saw the passenger side wheels of
the Silverado not only reach and cross the white line but near or make contact with the rumble
strip of the highway, further toward the edge of the roadway.

Trooper Romero stated that the third move or swerve occurred shortly after the second
one, possibly as a result of an effort to correct the movement of the second swerve, as the
Silverado straightened out from the curve.  This third touching upon or crossing the white line
also took place for only a brief moment.[3]

---

[3]     Trooper Romero changed his testimony as to whether the veering toward rumble strip
was the second or third event.  Initially, he stated that the swerve approaching or onto the rumble

6

A total of approximately 45 seconds elapsed between the observation of the first claimed traffic violation and the decision to initiate the stop.

In all, after the Troopers caught up to the Silverado to a close, observing distance, they continued to follow the Silverado for approximately one and one-half minutes.  After initiating pursuit and reaching the Silverado the Troopers followed the vehicle for approximately one and one-half miles.

Although they had video and audio recording capabilities, the Troopers did not video record their trailing of the Silverado until they signaled the Silverado to pull over to the berm of the highway at approximately mile marker 55 of the Ohio Turnpike.  Only then, as the Silverado turned off the highway and onto the berm of the highway, slowing to a stop, did the Troopers commence to video and audio record this incident.

## 2.  The Stop

At approximately 10:57 - 10:58 a.m, near mile post 55, Trooper Romero activated his lights and the in-vehicle video camera and audio device, and the Silverado and the trooper vehicle came to a stop off the side of the turnpike, approximately 3 miles west from the crossover where the Troopers first noticed the Silverado.

With the video camera and audio microphone activated, the Troopers exited their vehicle.

Trooper Romero approached the Silverado at the front, passenger's side of the Silverado, requested that the window of the passenger's side of the cab be lowered, initiated conversation and requested the driver's license and vehicle registration.

At the same time, Trooper Arnold approached the rear and passenger side of the vehicle

_____

strip was the third incident, but later stated that it was the second incident.

7

and inspected the wheel well, truck bed and spare tire.

The Silverado driver and passenger identified themselves to Trooper Romero as Anthony Vigna (the Claimant, herein) and Steven Curtis.  Trooper Romero asked them about the origin and destination of their trip, its purpose and whether they realized they had crossed the white line.  He asked Claimant Vigna  whether he was intoxicated or sleepy as well as for his driver's license and vehicle registration.  In response to these inquiries, Vigna stated that they were returning to Pittsburgh, California from Scranton Pennsylvania, where they had been for the past several days helping Curtis's brother move to Scranton.

Vigna stated that the vehicle was registered in Nevada and was owned by his brother (actually his brother-in-law) Cory Daiker.  Vigna indicated that he had permission to use the vehicle.  Vigna also informed Trooper Romero that his then present address differed from the address on his California driver's license.

Trooper Romero also asked passenger Curtis for his driver's license.   Romero indicated that he observed Curtis's hands shaking when he retrieved his license.  Curtis was from Arizona.  Neither Curtis nor Vigna were owners of the Silverado.

Trooper Romero stated that he noticed the distinct aroma of deodorizer or air freshener from within the cab of the Silverado.  He also observed three cell phones and a GPS device in plain view in the cab.

At approximately 11:00 a.m. Trooper Romero advised Vigna and Curtis that the Troopers were going to run their information.  He also asked that they roll up the driver's side window, which had been opened to facilitate conversation between Trooper Romero and Vigna and Curtis.

8

The Troopers then walked away from the Silverado toward their trooper vehicle. Trooper Romero instructed Trooper Arnold that they were to turn off their audio recording devices.  Thereafter, the audio recording devices were turned off, however the in-vehicle video recording continued to operate, as it had continuously from the point where the Troopers initiated the stop.

Romero instructed Arnold to run checks on the drivers' licenses of Vigna and Curtis

### 3.  Initiating Use of Detector Dog Hans and the Vehicle Sniff

At approximately 11:01 a.m. Trooper Romero removed K9 Hans from the trooper vehicle to commence a walk-around, vehicle sniff.

From approximately 11:01:50 a.m. to approximately 11:02:11 a.m., Trooper Romero and Hans walked around the Silverado.  This first walk/trot around as a free search.  Trooper Romero commenced the free search from behind the bed/back end, passenger side of the truck.  Trooper Romero held Hans's leash in his left hand and walked/trotted around the truck in a counter-clockwise (as viewed from above) direction, Hans being closer to the vehicle and Trooper Romero being further away.

During this free search Hans was allowed to walk/trot around the vehicle allegedly without his gaze or attention being directed by Trooper Romero in any way other than the Trooper was walking/trotting the dog around the truck.  During the free search Hans's behavior is claimed to have changed twice.  Hans's behavior changed at the driver's door area at approximately 11:02.00 a.m..  The leash became taut when the dog pulled back towards the driver's door area, sniff-investigated, then left that location on his own to resume the free search. Thereafter, at approximately 11:02:03 a.m., the free search was terminated at the right rear tail

light of the Silverado. At approximately 11:02:06 a.m., when Trooper Romero was about to switch to a directed search, Hans showed a second change in behavior and at approximately 11:02:08 a.m. Hans pulled toward the rear portion of the passenger door of the cab of the Silverado.  This occurred immediately prior to the Romero/Hans team beginning the second or directed/detailed search, Hans began pulling when at the right, rear taillight toward the passenger door,  low on the cab door seam on the passenger side.

Trooper Romero then began a directed search at approximately11:02:14 a.m.  The Trooper commenced the directed or detailed search by pointing or placing his right hand to or on the left rear tail light of the Silverado.  The Trooper held the leash with his left hand and with his right hand  presented areas to Hans to check.  During the directed search, Trooper Romero directed Hans's attention to specific areas using his body to block Hans, hand gestures, including "tapping" and verbal commands.  The Trooper never directed Hans to the area of the driver's door where dog had appeared to pause, briefly, but did not go back to on his own, during the free search.

During the directed search Trooper Romero tapped on different locations on the vehicle, causing Hans to jump up when the Trooper pointed high and to go low when directed toward low points.  Hans exhibited an alert by digging at the bottom left corner seam of the passenger rear door.  Hans did not positively respond to the area where trooper suspected there might have been a secret compartment at the back end of the truck bed.

At approximately11:02:24 to 11:02:26 a.m., Hans gave what Trooper Romero interpreted as an alert, i.e., behavior that constituted a final indication of the presence of  narcotics, where both of Hans's front paws were off the ground, both touching/scratching at the vehicle as he dug

at the seam of the passenger side, cab door, at bottom left corner.

During the whole time of the dog sniff of the Silverado, both free and directed/detailed, the Trooper's vehicle video recorder was activated but the audio remained off, as it had been subsequent to the Troopers' initial encounter with the occupants.

Trooper Romero terminated the deployment of Hans at approximately 11:02:43 a.m. and returned him to the trooper vehicle.

### 4.  After the Dog Sniff

Sometime during or immediately after the dog sniff, Ohio State Highway Patrol Sergeant David Schultz arrived at the stop location.

At approximately 11:04 to 11:06 a.m., first Claimant Vigna then passenger Curtis were instructed to exit the Silverado, at which time they were patted down and then secured in Sgt. Schultz's vehicle.  Trooper Romero advised Vigna and Curtis that he was going to do a vehicle search of the Silverado.  Thereafter at approximately 11:07 a.m., the Troopers and Sgt. Schultz commenced an inspection/search of the Silverado.  They searched inside the cab as well as the bed of the truck, the sides and underneath the rear portion of the bed of the truck.  As a result of what they observed the Troopers formed the belief that the Silverado contained a hidden compartment. This process took place over approximately 5 to 10 minutes.

Sgt. Schultz then called X-press Towing, and they agreed to assist in conducting a further search of the Silverado.

Trooper Romero drove the his vehicle to the X-press Towing garage.  Trooper Arnold drove the Silverado to the X-press garage.  Sgt. Schultz drove his trooper vehicle, with passengers Vigna and Curtis, to the X-press garage.

11

### 5.  At the Garage

The Troopers, Sgt. Schultz, the Silverado and Vigna and Curtis arrived at the X-press garage some  minutes after departing from the location of the stop.

Upon arriving at the garage, the Silverado is put on a hydraulic lift, yielding access to the underside, and further search and inspection of the vehicle, with the assistance of an X-press garage employee, commenced.  As they proceeded in their search, the mechanic and Trooper Romero identified what they believed was a hidden compartment at the underside of the vehicle, but did not find readily identifiable access points.  The mechanic then drilled a hole though the bottom of the truck bed and inserted a fiberoptic scope, which revealed images of what appeared to be plastic, food saver packages in a compartment under the truck bed.  The mechanic removed the scope, and Trooper Romero, with his own eyes, looked through the drilled hole and saw plastic wrapped packages at the edges of the hole.

At approximately 11:41 a.m. Trooper Romero and/or Sgt. Schultz approached Vigna and Curtis and  read them a Miranda warning.  Both Vigna and Curtis indicated that they understood the Miranda warning.  Vigna then asked what was going on, and Trooper Romero explained to him what he had found as the result of his search of the Silverado.  Trooper Romero further indicated to Vigna and Curtis that he intended to obtain full access to the hidden compartment and remove its contents.  Vigna and Curtis indicated they understood and asked no further questions.

Sometime later the mechanic observed an air bag suspension kit inside the hidden compartment, noticing an air bag at each corner of the compartment.  He applied external air pressure to the air bags and opened the compartment along the passenger's side, at which point

12

plastic food saver bags containing U.S. currency were seen.

The mechanic later determined how to hot wire the hidden compartment suspension system, enabling the compartment to be fully opened.  Eighteen separate plastic packages containing U.S. currency were found and removed.

Sgt. Schultz returned to Vigna and Curtis and told them what had happened, at which point Claimant Vigna claimed the money and requested an attorney.

During the time at the garage, additional law enforcement arrived: OSHP Sgt. Tim Root, Trooper Stacy Stidham, and Ohio Bureau Criminal Investigation Criminalist Keith Williamson, all participated in, or were present at, the search/inspection of the Silverado while it was located at  the X-press garage.   Criminalist Williamson took swabs of the truck bed, including one which came back with a fleck of something that subsequently tested positive for a trace amount of marijuana.  Criminalist Williamson performed a vacuum sweep of the truck, and three samples were taken.  The officers and troopers made a full inventory of the money and other items that were found in the truck cab or hidden compartment.

The Troopers then informed Vigna and Curtis that they were to be transported to the OSHP Trooper post.

At approximately 3:43 p.m. Vigna and Curtis, along with the seized property, were transported to the Trooper post.

A total of approximately four hours was spent at X-press garage.

**6.  At the OSHP Toledo Post**

Trooper Romero and Sgt. Schultz arrived at the Trooper post along with Vigna, Curtis and the Defendant property.  Vigna and Curtis were placed in separate rooms for interviews while at the Trooper post.   Each subject was interviewed separately by Sgt. Schultz and/or  FBI Special Agent Matt Meyer.

At the Toledo post two drug dogs, K9 Hans (Trooper Romero's K9 partner) and K9 Ringo tested the currency, and both indicated positively.  Troopers Romero and Arnold, assisted by Sgt. Schultz and FBI special agent Matt Meyer counted the currency.  They prepared property control forms upon completing their count of the money.  Since Claimant Vigna had asserted a claim for the money, Trooper Romero gave him a receipt for the seized currency.  The Troopers took photographs of the money as well as Vigna and Curtis.

The total amount of currency found was $1,032,980.00, almost 49,000 separate bills in different denominations.

The search was completed at approximately 10:00 p.m.  Per their request, Vigna and Curtis were escorted to a gas station located in the vicinity of a nearby hotel.  Both Vigna and Curtis were released, and neither was charged with an offense.

Vigna and Curtis spent a total of approximately six hours and fifteen minutes. at the Toledo Trooper post.

### 7.  Total Detention: Site of Traffic Stop through Trooper Post

There is no indication that Vigna and Curtis were free to leave or were given the option of leaving and returning later (to obtain a receipt for the currency) during the entire process from the initial stop through the completion of the currency count at the Trooper post.  Trooper Romero indicated that a significant amount of time was needed to allow for completion of the

14

detailed search of the vehicle and a detailed accounting of the contents, as well as the issuance of the receipt for the found currency.

It does not appear that Vigna and Curtis were Mirandized at the site of the stop or at any time prior to their arrival at the X-press garage, but they were Mirandized at approximately 11:41 a.m. while at the garage, shortly after Trooper Romero and the mechanic determined that there was a hidden compartment with contents.

FBI Agent Meyer and/or Sgt. Schultz and/or Trooper Romero questioned Vigna and/or Curtis at the Trooper post after they were Mirandized and after Vigna had requested an attorney. Other than Vigna asserting a claim for the Defendant currency and Vigna and Curtis indicating that they understood their Miranda warning, no evidence revealing the details of the questioning of Vigna or Curtis has been presented to this Court.

### V.     Analysis

The issues raised in Claimant Vigna's Motion to Suppress and Plaintiff United States of America's response thereto are as follows: (A) Does the Fourth Amendment exclusionary rule apply in civil forfeiture actions under 21 U.S.C. § 881; (B) Was there probable cause to justify the traffic stop of the Silverado by Troopers Romero and Arnold; (C) Is there a threshold requirement necessary to justify initiating a dog sniff of a vehicle at a traffic stop; (D) Was there probable cause to justify the search of the Silverado at the site of the stop and later at the garage; (E) Were Vigna and Curtis subject to a non-custodial traffic detention or were they under arrest; and, if under arrest, at what point did the detention convert into an arrest; (F) If the traffic stop detention of Vigna and Curtis merged into an arrest what effect did their being Mirandized and/or Vigna's request for counsel have on any subsequent communications between law

15

enforcement and Vigna or Curtis.

### A.  Fourth Amendment Exclusionary Rule and Civil Forfeiture Actions Under 21 U.S.C. § 881

This cause was initiated under 21 U.S.C. § 881, through which Plaintiff United States seeks forfeiture of Defendant currency, alleging that said currency is proceeds from illegal drug trafficking activities and/or was used or intended to be used to facilitate illegal drug trafficking in violation  of 21 U.S.C. § 841(a).

The Fourth Amendment provides that individuals shall be secure in their person and property from unreasonable search and seizure.  A defendant with possessory interest in a place searched or items seized has a legitimate expectation of privacy sufficient to invoke  Fourth Amendment's protections.  Rakas v. Illinois, 439 U.S. 128, 148 (1978); United States v. Padilla, 508 U.S.77 (1993).

21 U.S.C. § 881(a)  provides, in pertinent part, that

(a) The following shall be subject to forfeiture to the United States and no property right shall exist in them.
> . . .

> (6) All moneys . . . or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter, . . . .

The Fourth Amendment exclusionary rule has been held applicable in civil forfeiture cases because forfeiture, under§ 881, is considered quasi-criminal in nature. One 1958 Plymouth Sedan v. Pennsylvania, 380 U.S. 693 (1965); See also United States v. $53,082 U.S. Currency, 985 F.2d 245, 250 (6th Cir. 1993) ("Therefore, only legally-obtained evidence may be used to establish probable cause. In this case, the dog's reaction cannot be used to show probable cause

because it is the fruit of an illegal seizure and, as such, must be excluded.")  reh'g denied, 1993 U.S.App.Lexis 5920 (6th Cir. 1993).  Accordingly, the Fourth Amendment exclusionary rule is applicable in the current case.

### B.  Probable Cause: Traffic Stop of the Silverado

In Fourth Amendment terms a traffic stop entails a seizure of the driver who has a reasonable expectation of privacy sufficient to contest the legality of the stop and search. Brendlin v. California, 551 U.S. 249, 255 (2007); United States v. Torres-Ramos, 536 F.3d 542, 549 (6th Cir. 2008).  Stopping a vehicle and detaining its occupants amounts to a seizure under the Fourth Amendment. Delaware v Prouse, 440 U.S. 648 (1979).

As a general rule, the typical traffic stop occurs without a warrant, and warrantless searches are presumptively unconstitutional, thus, the government bears the burden of establishing that a warrantless search or seizure is reasonable and not violative of the Fourth Amendment.  Coolidge v. New Hampshire, 403 U.S. 443, 455  (1971).

At the outset, the Government must prove that the initial stop was justified at its inception. Delaware v. Prouse. at 663; United States v. Sharpe, 470 U.S. 675, 682 (1985); Terry v. Ohio, 392 U.S. 1, 20 (1968).

In the context of a traffic stop, an officer's decision to stop a vehicle is reasonable when the officer had "probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996); Prouse, 440 U.S. at 663.  "[S]o long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resultant stop is not unlawful and does not violate the Fourth Amendment."  United States v. Davis, 430 F.3d 345, 352 (6th Cir. 2005).  "The requirements of probable cause are satisfied where the facts and

17

circumstances within [the officers'] knowledge and of which they had reasonably trustworthy

information [are] sufficient in themselves to warrant a man of reasonable caution in the belief

that an offense has been or is being committed." Davis, 430 F.3d at 352 (internal quotations and

citations omitted).

Conversely, a traffic stop violates the Constitution if it is merely pretextual in nature, that

is, where the officer's decision to initiate the stop is based on no more than a mere hunch or

profile. Whren, supra. However, the actual, subjective motivations or intentions of officers is

irrelevant, that is, the constitutional reasonableness of traffic stops does not depend "on the

actual motivations of the individual officers involved . . . [s]ubjective intentions play no role in

ordinary, probable-cause Fourth Amendment analysis." Id. at 813. The issue is whether, viewed

according to objective criteria, the traffic stop is `unreasonable' under the circumstances." Id. A

law enforcement officer's "ulterior motivations, if any, are irrelevant." United States v. Sanford,

476 F.3d 391, 396 (6th Cir. 2007). Probable cause, however, requires that the officer's belief

[that a traffic violation had occurred] be reasonable." United States v. Gross, 550 F.3d 578, 584

(6th Cir. 2008).

Law enforcement officers must have objective reasons to stop a vehicle. Davis, supra.

However, notwithstanding the principle articulated in Whren, supra, an officer's subjective

motivations may nevertheless be relevant in assessing the credibility of the officer on the matter

of whether an actual traffic violation was truly observed, or there was no genuine traffic

violation, and the stop was a pretext. See, e.g, United States v. Freeman, 209 F.3d 464, 467-68

(6th Cir. 2000)  Viewed from this perspective it is, thus, unconstitutional to stop and detain

people, including operators of motor vehicles, even for a very short period of time just to see if

18

something might develop, in the absence of an articulable, reasonable suspicion of criminal activity or without the necessary probable cause provided by an actual traffic violation. See City of Indianapolis v. Edmond, 531 U.S. 32 (2000).

The question before this Court on the matter of the Fourth Amendment sufficiency of the traffic stop in this case is fairly straightforward: in their totality, were the events that lead to the traffic stop of the Silverado, sufficient to satisfy the probable cause predicate that a traffic violation had occurred?   Stated otherwise, would a reasonable person, having witnessed the movement of the Silverado, from the time that it was first observed by Troopers Romero and Arnold until the moment when the decision to stop was made, have concluded that a traffic violation had occurred.  Additionally, while acknowledging that, in accordance with Whren, supra, officer subjective motivation is not an essential consideration in determining whether a stop was based on probable cause, this Court must consider whether officer subjective motivation may have exerted sufficient influence on the decision making of Troopers Romero and Arnold, such that they may be found to be so lacking in credibility that the Court would be compelled to conclude that the stop of the Silverado was pretextual.  See, e.g, United States v. Freeman, 209 F.3d 464, supra.  This Court shall address the second question first.

### 1.  Officer Suspicion and Pretextual Stop

Review of the events that occurred from the moment that Troopers Romero and Arnold first observed the Silverado through the moment that they decided to initiate the stop of the Silverado reveal several factors that, arguably, could suggest that the Troopers elected to stop the Silverado based on a "hunch" rather than the legitimate probable cause predicate of an observed violation of a traffic law.  As the Supreme Court has stated, officers may not act on what is little

more than an impermissible "inchoate and unparticularized suspicion or hunch."  United States v. Sokolow, 490 U.S.1, 7 (1989).

In the instant case those factors that could lead to the conclusion that Troopers Romero and Arnold decided to stop the Silverado based on no more than mere suspicion of a hunch are that: (1) they claimed to have observed the Silverado slow down when they first noticed it east of where they were located on the Ohio Turnpike; (2) there appeared to be no visible gap between the frame and the bed of the truck; (3) there was the appearance of a new undercoating of paint in the wheel well on the driver's side of the vehicle; (4) the wheel well appeared to have recently been cleaned; (5) the spare tire, which was mounted on the underside, rear of the bed of the truck, appeared to be positioned unusually low; (6) Trooper Romero had previously encountered two other vehicles in 2001 and 2006, subsequently determined to be outfitted with hidden compartments, which altered or affected the outward appearance of those vehicles; (7) the driver of the Silverado was claimed to be looking back at the pursuing trooper vehicle in the driver's side mirror and that the driver appeared to be nervous and agitated and that his behavior appeared to change upon noticing that he was being followed by an OSHP vehicle; and (8) passenger was observed to look back on several occasions through the back window of the cab of the truck at the pursuing trooper vehicle.

Clearly, none of the factors, listed above (unless the distance between the surface of the roadway and the bottom of the spare tire mounted to the underside of the truck bed comprised an independent violation of Ohio traffic law, which claim has not been asserted here), individually, or in the aggregate, constituted a violation of Ohio traffic law.  Therefore, whether, and to what extent, these factors may have influenced and informed the Troopers' decision to stop the

Silverado, they are not events that comprise a violation of a traffic law, and thus do not satisfy

the probable cause predicate for justifying the Fourth Amendment intrusion of a traffic stop.

Despite the fact that noticing such events might be an indication of perspicacious police work

and the observational skills of a seasoned law enforcement officer, these events are only bases

for forming suspicions or hunches and not observations of a probable cause worthy occurrence,

i.e. a traffic violation.

However, the fact that a hunch or suspicion may have occurred to the Troopers sometime

between the Silverado first being noticed and finally being stopped, does not necessarily entail

that the basis of the stop was fabricated and pretextual.  This is essential to the principle

announced in Whren, supra, that a law enforcement officer's subjective motivations are not

directly relevant to the Fourth Amendment question before the Court.  Indeed, it would stretch

credulity and the reasoning of common sense, for a court to assume that no such intuitive

considerations would ever enter into the deliberations of a working law enforcement officer

when making the day to day decisions of his job.  Thus, it would be unreasonable were the court

not to acknowledge that such considerations may have factored into  an officer's decision to stop

a vehicle.  That a law enforcement officer may not act on what is little more than an

impermissible "inchoate and unparticularized suspicion or hunch."  United States v. Sokolow,

490 U.S.1, supra, at 7 only stands for the proposition that a decision to initiate a vehicle stop

based on only a hunch and nothing more does not withstand constitutional scrutiny.  Therefore, a

law enforcement officer may have suspicions or hunches, however, there must also be an

objectively valid basis for the probable cause determination (i.e., a genuine traffic violation) for

the stop to be justified.

## 2.  The Traffic Violation

The Ohio Revised Code provides, in pertinent part, that vehicles: "shall be driven, as nearly as is practicable, entirely within a single lane or line of traffic and shall not be moved from such lane or line until the driver has first ascertained that such movement can be made with safety."  § 4511.33 Ohio Revised Code.

The events that gave rise to the claimed violation of O.R.C.  § 4511.33 were the Troopers' observation of the Silverado's having moved, swerved or veered onto or across the white line on the passenger side of the highway on three separate occasions during the final approximately forty-five seconds of their following of the Silverado.  These three occurrences of violation of § 4511.33 were (a) the first  move or swerve near to or across the right white line for a brief moment while the Silverado was on an overpass; (b) the second move or swerve, which took place approximately one-eighth mile after the first incident, as the Silverado was proceeding through a curve near mile marker 56 on the highway, which may have lasted a few moments longer than the first swerve, and involved the Silverado going a bit further astray than in the first swerve, where the passenger side wheels of the Silverado not only reached and crossed the white line but neared or made contact with the rumble strip of the highway, located further toward the outer edge of the roadway; and (c)  the third move or swerve shortly after the second one, possibly as a result of an effort to correct the movement of the second swerve, as the Silverado straightened out from the curve and involved touching upon or crossing the white line for only a brief moment.

As described on their own terms, each of the three incidents separately constitutes a violation, if only a de minimis violation, of  § 4511.33.  Aggregated as a series comprising a

single larger incident, they represent a valid basis for finding a violation of R.C. § 4511.33, and, thus, in turn, an appropriate probable cause predicate justifying the Fourth Amendment protected stop of the Silverado.  As previously noted, probable cause only requires that the officer's belief that a traffic violation had occurred be reasonable.  United States v. Gross, supra, 550 F.3d 578, 584.

The cases cited by Claimant in his Motion to Suppress in support of the argument that the so called "lane change" violation found in this case was pretextual are inapposite.

In United States v. Freeman, 209 F.3d 464 (6th Cir. 2000) the Sixth Circuit found that a stop based on an ostensible lane change violation was pretextual and, thus, violated the defendant's Fourth Amendment protections.  The facts of Freeman are distinguishable from the facts of the instant case.  In Freeman the vehicle in question, a large Winnebago, had briefly traveled outside its lane for just a few feet, the Sixth Circuit found that an isolated incident of this nature involving a large motor home that had partially weaved into an emergency lane for a mere few feet and over an instant in time did not constitute a failure to keep the motor home within a single lane as nearly as practicable.  Id., at 466.  In the current case the vehicle involved was a pickup truck, not the significantly larger and, arguably, more intrinsically unwieldy Winnebago.  Also, in the instant case there were three separate occurrences,  one of which included the vehicle veering beyond the white line and onto, or almost onto, the rumble strip.

In United States v. Gross, 550 F.3d 578 (6th Cir. 2008), the Sixth Circuit found a stop based on a claimed lane change violation to be a pretext stop.  In Gross the vehicle in question was observed by the officer to have straddled two lanes for at least 100 yards.  However, the circumstances of the pretextual stop in Gross are distinguishable from the circumstances of the

23

stop in the current case.  In <u>Gross</u> the vehicle straddled two lanes at an area where the highway

expanded form two to three lanes and at the beginning of a steep ascent in the highway.

Moreover video showed other vehicles straddling lanes in a similar manner in the same area of

the highway.  Ultimately the court in <u>Gross</u> concluded that the officer's stop was pretextual

because the vehicular conduct involved represented what the court regarded as, essentially, a

slow lane change.  <u>Id</u>., at 583.  In the current case the Silverado was not operating on the

turnpike anywhere in the vicinity of where it widens from two to three lanes nor can the veering

off the side of the road be considered vehicular conduct incidental to an effort to make a lane

change.

 Accordingly, because they are distinguishable from the case at bar for the reasons

described, neither <u>Freeman</u> nor <u>Gross</u> provide support for Claimant's argument in this case that

the use of the lane change violation by the Troopers was an unconstitutional pretext intended to

create the facade of a traffic violation to justify the decision to stop the Silverado.

### 3. Credibility

 The foregoing discussion ultimately leads this Court to address the lynchpin of the traffic

stop issue in this case: the credibility of Troopers Romero and Arnold.

 Claimant Vigna argues that the Troopers' credibility is suspect, thus insinuating that the

ostensibly identified traffic violations (crossing the white lines) were mere window dressing

behind which hid the primary guiding determinants of the Troopers' decision to stop the

Silverado, i.e., the factors, listed above, that may have informed such suspicions or hunches that

the Troopers may have had about the Silverado and its occupants. Such a challenge to

the Troopers' credibility could reach so far as to induce doubt about the veracity of the Troopers'

observations of the existence and nature of the claimed swerves of the Silverado onto or over the white line.

In this regard, the Court notes that, despite the availability of video recording technology, the Troopers only initiated video recording of their pursuit of the Silverado <u>after</u> they decided to stop the vehicle, approximately at the moment they and the Silverado pulled off the side of the highway. The Court is concerned by the absence of video recording for this portion of the pursuit of the Silverado, especially considering that, regardless of whether or not it represents compliance with or departure from OSHP policy, it could have been implemented easily and inexpensively. The lack of such a recording only exacerbates the credibility questions raised by Claimant. On the other hand, the Court takes notice of the fact that, in the past, law enforcement conducted its activities without the benefit of such contemporary recording technologies, and courts made credibility determinations of law enforcement claims without reliance upon such recording devices.

In support of his challenge to the Troopers' credibility, Claimant directs this Court's attention to several cases involving the Trooper Romero and/or Trooper Arnold:. <u>Thomas v. Arnold</u>, 696 F.Supp. 2d 882 (N.D. Ohio 2010); <u>State v. Batchili</u> (2005) 2005 Ohio 6001 (<u>rec'd.</u> State v.Batchili (2007) 113 Ohio 3d. 403 (2007); <u>Ohio v. Loza-Gonzalez</u> (2005) 2005 Ohio 5735; <u>Ohio v. Reeves</u>, (May 12, 2000) 2000 Ohio App. Lexis 2004 (6th Dist. Nos. 99-CR-025, 99-CR-026) (unpublished). However, the Court is unconvinced that the conduct exemplified in these cases looms sufficiently large over the character of Troopers Romero and Arnold to support the view that the Troopers' credibility is sufficiently suspect to yield the conclusion that the primary, if not exclusive, determinant of the Troopers' decision to stop the Silverado was

mere hunch or suspicion and not a Fourth Amendment worthy observation of a <u>bona fide</u> traffic violation.

Accordingly, this Court finds that the stop of the Silverado by Troopers Romero and Arnold was based on incidents which, if viewed by a reasonable observer, would have been found to have constituted, in their aggregate, a violation of Ohio Revised Code § 4511.33 and, as such, provided the Troopers probable cause to stop the Silverado. Therefore, this Court finds that the Troopers had probable cause to stop the Silverado.

### C. Initiating a Dog Sniff of Vehicle during a Traffic Stop: Standard

Initiating a dog sniff search by a well-trained narcotics-detection dog - a search that does not expose non-contraband items that otherwise would remain hidden from public view - during a lawful traffic stop, generally does not implicate legitimate privacy interests. <u>Illinois v. Caballes</u>, 543 U.S. 405, 409 (2005). The Fourth Amendment does not require reasonable suspicion to justify using a drug-detection dog as long as the traffic stop and detention are not unlawful or improperly extended. . <u>United States v. Bell</u>, 555 F.3d 535, 539 (6th Cir. Ohio 2009).

A dog sniff of a vehicle pursuant to a lawful traffic stop does not constitute an intrusion of Fourth Amendment protected rights of the driver or occupants of the vehicle. Accordingly, where a vehicle has been rightfully stopped there is no impediment to, nor a standard that must be met for law enforcement to initiate, a dog sniff of the vehicle.

However, as noted in <u>United States v. Bell</u>, <u>supra</u>, the dog sniff cannot be used as a device to extend inappropriately the length of time of the stop and detention. In the current case the Troopers stopped the Silverado at approximately 10:57 - 10:58 a.m. questioned the occupants

of the Silverado, initiated the dog sniff at approximately 11:00 a.m. and terminated the dog sniff

no later than 11:03 or 11:04 a.m. Any events that transpired after 11:04 a.m. were a direct result

of Trooper Romero having determined that K9 Hans had positively alerted on the Silverado.

Accordingly, the issue of the initiation of the dog sniff is a nullity, as the initiation of the

sniff at the situs of a lawful traffic stop does not, in and of itself implicate, any constitutionally

protected rights.[4]  As to the dog sniff being used to improperly extend the stop and detention, the

Court finds that, in total, no more than seven minutes elapsed from the commencement of the

stop to the termination of the dog sniff and the return of K9 Hans to the trooper vehicle.  This is

a reasonable amount of time for these events to have taken place and, thus, does not, in and of

itself, represent an inappropriate use of the dog sniff used to create an impermissible extension of

the stop and detention.

### D.  Probable Cause: Search of the Silverado

Although the sniff of the Silverado did not implicate constitutional concerns the

subsequent search of the vehicle is protected under the Fourth Amendment.

Generally, searches conducted outside judicial process, without prior approval by judge

or magistrate, are per se unreasonable under the Fourth Amendment, subject to only a few

specifically established and well-delineated exceptions. Arizona v. Gant, 129 S.Ct.  1710, 1716

---

[4]  Note that the Supreme Court has recently granted writ of certiorari in Florida v. Jardines, 181 L. Ed. 2d 726; 2012 U.S. LEXIS 7; 80 U.S.L.W. 3392 (January 6, 2012) where the Court will take up the related issue of the constitutionality of  initiating a dog sniff at a residence. See also Jardines v. State, 73 So. 3d 34; 2011 Fla. LEXIS 884; 36 Fla. L. Weekly S 147, ( Fla. 2011), rehearing denied, Jardines v. State, 2011 Fla. LEXIS 1564 (Fla., July 7, 2011) (reversal of defendant's motion to suppress was improper because the warrantless "sniff test," that was conducted at the front door of the residence, was an unreasonable government intrusion into the sanctity of the home and violated U.S. Const. amend. IV.)

(2009); <u>California v. Acevedo</u>, 500 U.S. 565 (1991).  One such exception is the automobile exception, requiring probable cause to believe that contraband or evidence will be found in the automobile searched  <u>United States v. Ross</u>, 456 U.S.798, 800 (1982).

In the absence of a warrant, a positive alert by a reliable drug detection canine for the presence of a controlled substance is sufficient to supply the probable cause to search an otherwise Fourth Amendment protected vehicle for the presence of a controlled substance and, therefore, to justify the search of the vehicle.  <u>United States v. Torres-Ramos</u>, 536 F.3d 542, 554 (6th Cir.2008); <u>United States v. Diaz</u>, 25 F.3d 392, 393- 394 (6th Cir. 1994);  <u>United States v. Knox</u>, 839 F.2d 285, 294 n.4 (6th Cir. 1988)

However, a dog sniff conducted during an unlawful detention, violates the Fourth Amendment. <u>Illinois v. Caballes</u>, <u>supra</u>, 543 U.S. at 407-408; <u>United States v. Perez</u>, 440 F.3d 363, 374(6th Cir. 2006).

In cases where a vehicle search, incident to a lawful traffic stop, is initiated on the basis of an alert by a drug detection dog the probable cause requirement for post-sniff vehicle searches is satisfied where the dog has been determined to have met the standard of reliability.  This reliability standard can be established by a showing that the dog has been trained and certified. The government bears the burden of establishing that there was probable cause to justify the vehicle search and, thus, the burden of proving that the detection dog was reliable.  <u>Diaz</u>, <u>supra</u>, at 394.

The means by which training and certification requirements are established have been held not to require that the government produce actual training or certification records.  Rather, testimony about the dog's training and certification, and thus, reliability suffices.  <u>Id</u>.  Where the

28

dog's reliability is proven through evidence that the dog was trained and certified, the government has met its burden of showing that law enforcement had probable cause to conduct the search of the vehicle.  Id. The testimony of a dog's handler, that the dog was trained and certified,  may be sufficient to establish reliability. Diaz, 25 F. 3d at 396.  Conversely, while probable cause in certain situations may be supported by positive canine alerts,  probable cause will fail, if the  government cannot meet its burden of presenting sufficient evidence demonstrating that the particular narcotics-detection canine team is certified, well trained and, thus, reliable. United States v. Place, 462 U.S. 696, 706-707 (1983).

### 1.  Reliability

As discussed, above, a detection dog's alert behavior shall be considered reliable, and, thus, will supply the probable cause predicate for a warrantless search of a vehicle subject to a lawful traffic stop if evidence is adduced that the dog was trained and certified.   Torres-Ramos, supra, 536 F.3d 542; Diaz, supra, 25 F.3d 392; Knox, supra, 839 F.2d 285.

The proper application of this standard, and the related concerns of dog training, training record keeping, criteria for certification, adequacy of certifying organization, K9-handler relationship, and other relevant issues pertinent to the use of detector dogs as a means to satisfy the probable cause requirement incident to warrantless Fourth Amendment intrusions have been matters of much contention in this case, and were addressed at length at the suppression hearing(s) as well as analyzed in detail in parties' pre and post-hearing briefs and will be discussed by this Court more fully, below.

However, the issue presently before this Court has a much narrower scope: (1) what is the standard of reliability for drug detector dogs that has been established by the Sixth Circuit;

29

and (2) did K9 Hans meet that standard.[5]

The Sixth Circuit has articulated the standard for adjudging detector dog reliability in

Diaz, supra, 25 F.3d 392.

In Diaz, the Sixth Circuit rejected defendant's argument, viz: that the government's

failure to produce training and certification records of detector dog Dingo precluded a finding of

reliability because the records were necessary to establish that Dingo was properly trained and

certified.  Rather, the Sixth Circuit agreed with the district court that credible testimony that the

dog was trained and certified established reliability, even in the absence of training records.  See

Diaz, supra, 25 F.3d at 395.  The Sixth Circuit wrote "[the defendant] argued that the

government could not establish Dingo's reliability because [the officer] failed to bring the dog's

training and performance records to court and so was unable to answer precisely how many

searches Dingo had done and how many times drugs were not discovered when Dingo indicated,

[and because] . . . [the officer] and Dingo were improperly trained." Id.  The court of appeals

rejected  defendant's claim and determined that the district court's finding of fact as to Dingo's

reliability was not clearly erroneous.  The court stated that the officer who handled and used

Dingo "testified as to her and Dingo's training, certification, and experience. The district judge

heard the testimony and made a credibility determination: [that the officer] was believable. [The

officer's] testimony supports a finding that Dingo was trained and reliable. After reviewing the

_____

[5]  As this Court is bound by precedent to follow the Sixth Circuit on the matter of
detector dog reliability this Court is compelled to refrain from articulating such concerns or
misgivings it may have regarding the larger questions involved with the use of detector dogs
when addressing issues of practical, decisional import in this case.  That being said, it is this
Court's considered opinion that the time may have come for courts to revisit the larger issues
incident to whether more exacting and scientific standards shall be applied to the use of dogs as a
mechanism that enables law enforcement intrusion into a Fourth Amendment protected zone.

record, we are not left with a definite and firm conviction that a mistake has been made." Id.

In United States v. Torres-Ramos, supra, 536 F.3d at 554 the Court determined that the dog "Emir" was reliable on the basis of his handler's testimony, which included that "Emir had been certified by three different agencies: the North American Working Dog Association and state accreditation programs in Ohio and Indiana. . . . [and that the officer had] personally conducted more than 100 training sessions with Emir, which he documented." Id.  Despite conflicting testimony from defendant's animal behavior expert that Emir had failed to certify on residual odors and that the " Ohio certification process for drug sniffing dogs was inherently flawed." Id., and references by defendants to the claim that much currency in the United States is tainted by residual amounts of cocaine, the Court found Emir to be reliable, stating, "[the handler/officer] testified to the dog's considerable training and prior certifications, which is sufficient to establish his reliability. Because Emir is reliable and actively alerted to the van (i.e. he scratched at the location where the cocaine was subsequently found), the government established probable cause for a search of the van." Id.

Accordingly, the Sixth Circuit precedent, which this Court is bound to follow, is that detector dog reliability is established by credible testimony from the dog's handler/partner (or, arguably, by other knowledgeable and credible witnesses) that the dog was trained and certified. See also United States v. Gooch, 499 F.3d 596, 603 (6th Cir. 2007); United States v. Boxley, 373 F.3d 759. 762 (6th Cir. 2004); United States v. Hill, 195 F.3d 258, 273 (6th Cir.1999);  United States v. Booker, 2010 U.S. Dist. LEXIS 124839 (E.D. Tenn. Sept. 29, 2010).

Testimony and other evidence pertinent to the issue of K9 Hans's training and certification and, thus, his reliability as a detection  dog, were introduced in this case.

31

### a. **Hans's Training**

Generally speaking, Hans was a trained detector dog.

Hans's records indicate that, in addition to certifications, the Romero/Hans team had ongoing in house training and quarterly evaluations, including quarterly evaluations with their master trainer. Romero and Hans trained 3 to 4 times per month. This training included, for example, setting up scenarios, placing or not placing a contraband in a hidden location, and giving the dog a specified area to walk, to check Hans's accuracy.

Hans was trained to detect residual odors using pieces of cotton or towels/cloths that had previously been kept inside closed containers with contraband then later placed inside pipes which were located in a field or in various small, narrow or otherwise inaccessible places in a building for Hans to find, and Hans would positively indicate in these areas. However, the record keeping of Hans's training did not include the manner in which drugs were packaged or other information about specifics of the locations where drugs were hidden. These factors raise questions about whether, during training, the dog was responding to features of the packaging rather than the odor of drugs.

Hans's training records indicate that in 2009 and 2010 he received training involving the use of untainted, shredded currency as conflict item. However, no testimony or evidence indicate that he received such training prior to the to March 25, 2009, the date of the Silverado stop.

Trooper Romero's and Hans's training and evaluation included instruction on handlers avoiding queuing and/or prompting. This training would occur in front of observers who would critique the team's performance. Trooper Romero indicated that he understood the difference

32

between presenting an item to the dog to sniff during a detail sniff and queuing.

During another training session, Hans sniffed 15 parcels on a gym floor, with just 1 containing a hide, and Hans alerted to that parcel only

Other training records from before the 3/25/2009 stop show that Hans was presented with numerous blank locations and didn't positively indicate, e.g., training session 10/14 - 16/2008 Seneca County Fair grounds Hans was presented with 4 blank vehicles and alerted to none; training session 11/5/2008, included 6 blank vehicles and Hans did not alert; training session 1/21/2009 included 6 blank rooms at the Cleveland bus garage as well as 4 rows of blank lockers and Hans did not alert.

### b.  Field Deployments

The Ohio State Highway Patrol stopped preparing canine field reports after 2005.

Regarding Hans's field deployments, Trooper Romero stated that Hans had indicated anywhere between 50 - 100 times where only trace amounts of contraband were present in a vehicle.  However, the Trooper agreed that he would be guessing as to whether any drugs were actually  in those vehicles.

Trooper Romero stated that Hans was able to sniff narcotic and non-narcotic odors in actual money seizures.

### c.  Certifications

The Romero/Hans team was first trained and certified together as a team in 2001.  Hans and Trooper Romero were together for eight years as of 3/25/2009.  He and Hans trained at the dog handler's program at Lynwood's Kennels, which included several hundred practical exercises

33

After their initial training Romero and Hans were certified by the North American Police Work Dog Association (NAPWDA), which certification is good for one year and by the Ohio Peace Officer's Training Academy (OPOTA), which certification is good for two years.  These certifications were for the for odors of marijuana, cocaine, heroin, methamphetamine.  The team was recertified annually after 2001

NAPWDA is a private company not regulated by government or any agencies, and is supported by police department membership fees.

Hans's certification records did not include certain detailed information, e.g., there were no record indicating where the substance was placed, how long it was placed there, whether the search was a free or directed search, whether the handler knew where the contraband was located;  time ratios, measurement details that would indicate height or depth of sample placement.  The certification only tells that the dog was certified on a given date for indicated amounts.

The OPOTA form does not indicate specific amounts for which the dog was certified.

Hans's certification involved non-trace amounts of the contraband he was trained to detect, e.g., 9 grams being the smallest amount, with 40 grams for marijuana.  However, the NAPWDA standard prescribes that a  minimum of 1 gram be used during certification process, and Hans's training records do not indicate that at any time from 2001 until Hans retired was he tested using that amount.  Also, at no time in training or certification was trace amount used.

The examination for certification is a one day event.  The smallest amounts used to test/certify were 10 grams for  heroin and 20 to 40 grams for other substances.  Hans was neither certified for finding trace amounts nor for finding odors on currency.

34

At every certification Hans and Romero attended (e.g., NAPWDA in 2007,2008 and 2009 & OPOTA 2004, 2008 and 2010 Hans attained a perfect score.  The certification process involves putting narcotics in hiding places.  The dog/handler teams are given blind tests, neither dog nor handler knows where the item was located.  Trooper Romero stated that during theses sessions Hans located all the hides, didn't miss any and didn't false alert.  Hans's certification shows that the team tested on buildings, vehicles and luggage/locker searches.  For example Hans's 3/29/2008 NAPWDA certification involved vehicle searches that included 6 live and 2 blank vehicles.  Hans did not miss any locations, live or blank.  For the 2008 OPOTA certification, hides included all four substances, and Hans was successful for every hide.

No outside agency, whether governmental or non-governmental, oversees or provides standards for either organization.  Certification has no uniform standards or guidelines.  Certifying agencies are unregulated.  There is a question as to whether records are sufficient to give weight to certifications (e.g., they fail to state how much drug was packaged, where drugs were placed, whether the test was a free or detailed search, how long the drugs had been hidden, whether the test was blind or the handler was told where the drugs were located and testing amounts were generally 10 grams or more).

This team was not certified for odors from trace amounts, residual odors or currency.  Trooper Romero and the Government's expert Bowman both testified that Hans's certification says nothing about the dog's ability to detect trace amounts.

### d.  Claimant's Expert Nicely on Hans's Training

Claimant's expert Steven Nicely has been involved with drug detection dogs since 1973 and has testified as an expert on previous occasions.

Nicely noted the absence of field deployment report records since 2005 and opined that without field records there is no way to gauge dog's performance.  Nicely reviewed the field reports of  2001 - 2005 and found that only 23% of the time when Hans exhibited a positive response were non-trace amounts of drug recovered, and about 60% of searches to which Hans exhibited positive response nothing was found.

Nicely also stated that field deployment records are reliable indicators of a dog's ability and performance because the environment is not controlled and such field deployment records are useful because they can reveal problems in real world search conditions, e.g., the dog being distracted, fearful or interested in matters other than those for which it was deployed

Nicely described the Hoffman effect, where a dog's performance was better in testing than in the field;  the Rosenthal effect: where emotions of the person handling and evaluating the dog may cause an exaggerated perception of dog's performance as well as the UC Davis study on unintentional queuing.

Nicely found that there were significant problems with record keeping of Hans's training sessions (e.g., the records did not describe packaging or specify the location where the contraband was hidden).

Nicely also discussed discrimination training, which is training that allows a dog to be exposed to items that might induce it to falsely alert.  Discrimination training is used to train the dog to differentiate contraband from other items, e.g., packaging, cutting agents, etc., that the dog might inadvertently associate with what it is being trained to detect.  There are no records that Hans had ever received such discrimination training.  Records do not reflect that Hans was trained to discriminate narcotics from other items such as packages.

36

Nicely also stated that discrimination training was important to help dogs learn to avoid giving false responses.

### e. Government's Expert Bowman on Hans's Training

The Government's expert Daniel Bowman has regularly evaluated up to twenty-four separate handler/dog units as much as four times a year.

Bowman stated that field reports are not particularly useful because they do not account for the myriad unknowns to which a dog might be exposed in the field and, thus, should not be used as barometer of a dog's reliability.

Bowman stated that a free search followed by a directed search is an industry norm. Bowman also noted that a free search is equally as valuable as directed search

In Bowman's view, Hans displayed strong proficiency in discriminating between conflicting odors.

Reviewing Hans's training history, Bowman stated that the dog gave a positive indication of narcotic odor in situations that included novel/conflicting odors, including residential apartments with furniture, clothing, garbage and food odors, and searching mail parcels that contained conflicting odors emanating from the presence of currency. Bowman stated that Hans was able to sniff cars stopped on highways without being distracted by other vehicles, pedestrian traffic or passing animals.

Bowman observed the Romero/Hans team on three separate training occasions, twice in 2010 and once in 2011, where they performed a single blind evaluation under real world conditions. However, the training records do not indicate Bowman's input, if any, during these sessions. These direct observations of the Romero/Hans team occurred after the incident at issue

37

in this case.

Bowman did not review any of the Romero/Hans team's field performance records, and he discounted the value of field records as accurate indicators of reliability, because the field is not an environment where the variables are known or controlled.  However, he did state that such field records could be useful for showing problems that a handler/dog team might be having in an actual search environment, e.g., dog distraction, fear of guard rails, interest in odor of road kill, etc.

The Government's expert Bowman testified that there were no records that indicated that Hans was trained to detect a fleck or trace amount of marijuana.

Regarding one training exercise that took place after 3/25/2009, where Hans alerted to a Dodge Ram truck that contained no contraband (i.e., a so called "blank"), Bowman stated that Hans wasn't mistaken, even though no actual narcotic was present.  Bowman opined that the fact that no recognizable amount of narcotic was present didn't mean that there was no narcotic odor present.  This was the only report of such an incident in Hans's training records.

Bowman found Hans to be a reliable dog, even though his only direct, personal experience with the team was after the traffic stop in question.  He did, however, review a limited number of training records. He noted that Hans did not alert during the free search.  He stated that the lack of field records after 2005 was neither an indicator of reliability nor non-reliability.

Therefore, pursuant to its review of the foregoing, and in accordance with <u>Diaz</u>, this Court finds that K9 Hans (and the Romero/Hans handler/dog team) was trained and certified and, thus, reliable.

### 2.  The Dog Sniff

In the instant case the following considerations are relevant to determining whether Troopers Romero and Arnold had met the probable cause requirement for conducting the search of the Silverado.

The sniff commenced at approximately 11:01:50 a.m., with Trooper Romero and Hans conducting an initial "free" search.  During this free search Hans indicated interest at two locations.  Hans's first behaved in a manner that indicated interest at the driver side door area at approximately 11:02.00 a.m.  His leash became taut when Hans pulled back towards the driver's door area, sniff-investigated, then left that location on his own to resume the free search. Thereafter at approximately 11:02:03 a.m. the free search was terminated at the right rear tail light of the Silverado.  Hans indicated interest a second time at approximately 11:02:06 a.m., when Trooper Romero was about to switch to a directed search.  Hans showed a change in behavior and at approximately 11:02:08 a.m. Hans began pulling when at the right, rear taillight toward the passenger door,  low on the cab door seam on the passenger side and pulled toward the rear portion of the  passenger door of cab of the Silverado.  This occurred immediately prior to beginning the directed/detailed search and at the very end of the free search.

Trooper Romero then began the directed search at approximately11:02:14 a.m. At approximately11:02:24 to 11:02:26 a.m., Hans gave what Trooper Romero interpreted as an alert, i.e., behavior that constituted a final indication of the presence of  narcotics, where both of Hans's front paws were off the ground, both touching/scratching at the vehicle as he dug at the seam of the passenger side, cab door, at bottom left corner.   Hans exhibited this final alert by digging at the bottom left corner seam of the passenger side door of the cab.  The dog did not

39

positively respond to the area where trooper suspected there might have been a secret compartment at the back end of the truck bed.

During the whole time of the dog sniff of the Silverado, both free and directed/detailed, the Trooper's vehicle video recorder was activated but the audio remained off as it had been subsequent to the Troopers' initial encounter with occupants.

Trooper Romero terminated the deployment of Hans at approximately 11:02:43 a.m. and returned him to the trooper vehicle.

As to the matter of the sniff, Trooper Romero stated that Hans's behavior at the end of the free search - where Hans indicated interest by pulling toward the passenger side door of the cab and then, moments later, after Trooper Romero commenced the directed search, when Hans placed his front paws high and then scratched at and pulled low toward the rear, lower end door seam of  the passenger side door near where the bed of the truck met the cab - indicated a positive alert.

### a.  Claimant's Expert Nicely on the 3/25/2009 Search

Claimant's expert Nicely opined that, because Hans failed to alert during free search to an odor he was trained to detect and because he should have exhibited a response during free search, the behavior exhibited by Hans at the passenger door seam/where truck bed met cab, was not an alert but, rather, behavior consistent with prompt dependency.

Nicely noted that during the free search Hans shows interest by slowing down when at the passenger rear door of the vehicle and during the directed search Hans jumped up or went low depending on where Trooper Romero directed him.  Nicely observed that when Hans showed interest, but chose to leave a spot, during the free search, Hans was discriminating

40

which, according to Nicely, meant that he was indicating there was no target odor there.  Nicely
stated that Romero should not have taken the dog back to that area again and that his decision to
do so indicates he did not honor the dog's ability to distinguish, thus the team did not have
sufficient discrimination training.  Nicely opined that when Hans originally sniffed and walked
away and had be actually observed a target odor on the free search he also would have exhibited
his trained response.  According to Nicely, this behavior shows that Hans was exhibiting prompt
dependency.

### b. Government's Expert Bowman on the 3/25/2009 Search

Bowman opined that during the detailed search Hans scratched low where the bed of the
truck met the cab and that this behavior indicated that the dog was responding to the presence of
contraband.  Bowman described Hans's quick head snap, toward where the bed of the truck
meets the cab on the driver's side.  He noted that, as Hans rounded the rear side of the passenger
area where the cab met the bed, Hans again changed behavior, reflecting that he was responding
to an odor of interest.  Bowman noted Hans's behavior on the free search and stated that Hans
encountered an odor he found interesting and chose to examine it but left that area and then,
again, rounding the rear side of the passenger area where cab meets bed, he changed behavior,
which reflected detection of an odor of interest, but again no response.

Regarding whether Hans actually alerted, Plaintiff's expert Bowman opined that during
the detailed search Hans's scratching low where the bed of the truck and the cab met, indicated
the presence of contraband.

Bowman says Hans scratched low during detail search where the bed of the truck met the
cab.  However, he also could not say what it was in this case that the dog responded to, since no

source could corroborate the dog's reaction, and the history of the vehicle was unascertainable. Neither Trooper Romero nor Government's expert Bowman could say what it was to which the dog responded, no contraband (other than the trace fleck of marijuana) was found to support dog's response.

Because this Court has found K9 Hans to be reliable, and notwithstanding certain indicators to the contrary,  the Court further finds that Hans's March 25, 2009 behavior of placing his paws high and then pulling and scratching low on the passenger side near the lower seam of the rear of the cab door toward where the bed of the truck meets the cab constituted a bona fide positive alert for contraband and, thereby, provided probable cause for the search of the Silverado.

### E.  Traffic Stop: Detention or Arrest, and if Arrest

A Canine sniff that does not improperly extend the duration of a traffic stop will not violate the Fourth Amendment. Illinois v. Caballes, supra, 543 U.S. at 408-409.  As previously discussed, the Troopers stopped the Silverado at approximately 10:57 - 10:58 a.m. questioned the occupants of the Silverado, initiated the dog sniff at approximately 11:00 a.m. and terminated the dog sniff no later than 11:03 or 11:04 a.m.  The events that transpired after 11:04 a.m. were a direct result of Trooper Romero having determined that K9 Hans had positively alerted on the Silverado.   The total amount of time from the initiation of the traffic stop to the termination of the dog sniff and the return of canine Hans to the trooper vehicle was no more than seven minutes.  It would have taken at least this long for Trooper Arnold to have run an identification/background check on Claimant Vigna and passenger Curtis.  Thus, the amount of time expended on the dog sniff was reasonable and did not constitute an improper extension of

the duration of the traffic or the detention of Claimant and was consistent with the original purpose of the traffic stop.

The question for the Court then becomes whether Claimant "was detained longer than reasonably necessary for the Officers to complete the purpose of the stop . . .." United States v. Bell, supra, 555 F.3d at 541, and whether at any point - from the time Trooper Romero terminated the dog sniff until approximately 10:00 p.m. that evening when Vigna and Curtis departed from the Trooper post - did the lawful traffic detention transform into an arrest.

Even where the government can demonstrate sufficient grounds to justify a temporary detention, the mere suspicion of criminality cannot be transformed into probable cause necessary to support a de facto arrest. Sharpe, supra, 470 U.S. at 685-686; United State v. Royer, 460 U.S. 491, 500 (1983); United States v. Obasa, 15 F.3d 603, 607- 609 (6th Cir. 1994).   As a general rule, the length and circumstances of a traffic stop detention may cause the detention to be transformed a into de facto arrest.  Where police remove a person from a place and transport him elsewhere, including to a police station, the question is raised whether such further detention for investigative purposes merges into an arrest without probable cause.  Hayes v. Florida, 470 U.S. 811, 815-816 (1985)

> There is no doubt that at some point in the investigative process, police procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments. . . .  And our view continues to be that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes. We adhere to the view that such seizures, at least where not under judicial supervision, are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause.  Id. (citations omitted).

Securing a suspect in back of patrol car and questioning the suspect has been held to cross the line and transform a detention into an arrest.  United States v Richardson, 949 F.2d 851, 857 (6th 1991).  Transporting a suspect in police custody will cause a detention to merge into a de facto arrest.  Obasa,, supra,15 F.3d at 607-609.

On the other hand, law enforcement officers are permitted to undertake actions that are related to the purpose of the stop. Hill, supra, 195 F.3d at 267.  For example, where a police officer requests a driver's license, registration and rental papers, and then runs a computer check and, subsequently, issues a citation does not exceed the scope of a traffic stop for a speeding ticket.  United States v. Bonilla, 357 Fed. Appx. 693, 696 (6th Cir. 2009) (unpublished).  Also, an officer's brief inquiry into matters unrelated to the justification for the traffic stop do not necessarily convert the encounter into something other than a lawful temporary seizure, i.e., non-custodial detention, so long as such inquiries do not measurably extend the duration of the stop. Arizona v. Johnson, 555 U.S. 323, 333-34 (2009).  However, where police detain a motorist longer than is reasonably necessary to issue  traffic citation, the officer must have reasonable suspicion that the individual has engaged in more extensive criminal conduct.  United States v. Townsend, 305 F.3d 537, 541 (6th Cir. 2002).

In the instant case the traffic stop commenced at approximately 10:57 to 10:58 a.m., at this point the temporary seizure or detention of Vigna and Curtis began.  The driver and passenger were questioned, the Silverado was visually inspected, a dog sniff was initiated and completed with the dog behaving in a manner that was consistent with a positive alert.  The dog sniff was terminated and Trooper Romero returned Hans to the trooper vehicle by approximately 11:04 a.m.  All of this took place in less than seven minutes.

44

Thereafter, the following events occurred.

Sometime during or immediately after the dog sniff Ohio State Highway Patrol Sergeant David Schultz arrived at the stop location.  At approximately 11:04 to 11:06 a.m., first Claimant Vigna the passenger Curtis were instructed to exit the Silverado, at which time they are patted down and then secured in Sgt. Schultz's vehicle.  Trooper Romero advised Vigna and Curtis that he was going to do a vehicle search of the Silverado.  Thereafter at approximately 11:07 a.m., the Troopers and Sgt. Schultz commenced an inspection/search of the Silverado.  They search inside the cab as well as the bed of the truck the sides and underneath the rear portion of the bed of the truck.  As a result of what they observed the Troopers formed the belief that the Silverado contained a hidden compartment. This process took place over approximately 5 to 10 minutes.

Sgt. Schultz then called X-press Towing, and they agreed to assist in conducting a further search of the Silverado.

Trooper Romero drove the trooper vehicle and Trooper Arnold drove the Silverado to the X-press towing garage.  Sgt. Schultz drove his trooper vehicle, containing Vigna and Curtis, to the X-press garage.

The Troopers, Sgt. Schultz, the Silverado and Vigna and Curtis arrived at the X-press garage some  minutes after departing from the location of the stop.

Upon arriving at the garage the Silverado was put on a hydraulic lift, yielding access to the underside of the Silverado, and further search and inspection of the vehicle, with the assistance of an X-press garage employee, commenced.  As they proceeded in their search, the mechanic and Trooper Romero identified what was believed to have been a hidden compartment at the underside of the vehicle, but did not find readily identifiable access points.  The mechanic

then drilled a hole though the bottom of the truck bed and inserted a fiberoptic scope, which revealed images of what appeared to be plastic, food saver packages in a compartment under the truck bed.  The mechanic removed the scope, and Trooper Romero, with his own eyes, looks through the drilled hole and saw plastic wrapped packages at the edges of the hole.

At approximately 11:41 a.m. Trooper Romero and/or Sgt. Schultz approached Vigna and Curtis and  read them a Miranda warning.  Both Vigna and Curtis indicated they understood the Miranda warning.  Vigna then asked what was going on, and Trooper Romero explained to him what he had found as the result of his search of the Silverado.  Trooper Romero further indicated to Vigna and Curtis that he intended to obtain full access to the hidden compartment he had discovered and remove its contents.  Vigna and Curtis indicated they understood and asked no further questions.

Eventually the mechanic determined how to hot wire an air-bag suspension system within the hidden compartment and activated it.  Eighteen separate plastic packages containing U.S. currency were found and removed.

Sgt. Schultz returned to Vigna and Curtis and told them what had happened, at which point Claimant Vigna claimed the money and requested an attorney.

During the time at the garage additional law enforcement arrived: OSHP Sgt. Tim Root, Trooper Stacy Stidham, Ohio Bureau Criminal Investigation Criminalist Keith Williamson all participated in or were present at the search/inspection of the Silverado while it was located at the X-press garage.   Criminalist Williamson took swabs of truck bed, including one which came back with a fleck of something that subsequently tested positive for a trace amount of marijuana. Criminalist Williamson performed a vacuum sweep of the truck, and three samples were taken.

46

The officers and troopers made a full inventory of the money and other items that were found in the truck cab or hidden compartment.

The Troopers then informed Vigna and Curtis that they were to be transported to the OSHP Trooper post.  At approximately 3:43 p.m. Vigna and Curtis, along with the seized property, were then transported to the Trooper post.  A total of approximately four hours was spent at the X-press Towing garage.

Trooper Romero and Sgt. Schultz arrived at the Trooper post along with Vigna, Curtis and the property.  Vigna and Curtis were  placed in separate rooms for interviews while at the Trooper post.   Each subject was interviewed separately by Sgt. Schultz and/or  FBI Meyer at the Trooper post.

Troopers Romero and Arnold, assisted by Sgt. Schultz and FBI Special Agent Matt Meyer counted the currency.  They prepared property control forms upon completing their count of the money.  Since Claimant Vigna had asserted a claim for the money, Trooper Romero gave him a receipt for the seized currency.  The Troopers took photographs of the money as well as Vigna and Curtis.

The Troopers and other law enforcement personnel at the scene completed their search of the Silverado at approximately 10:00 p.m.  Per their request, Vigna and Curtis were escorted to a gas station located in the vicinity of a nearby hotel.  Both Vigna and Curtis were released, and neither was charged with an offense.

Vigna and Curtis spent a total of approximately six hours and fifteen minutes. at the Toledo Trooper post.  All in all, Vigna and Curtis spent approximately eleven hours, from approximately 11:00 a.m. until approximately 10:00 p.m., in police custody.

There is no evidence in the record that at any time during the whole process - from the initial stop through the completion of the currency count at the Trooper post - that Vigna and Curtis were free to leave or were given the option of leaving and returning later.  Trooper Romero indicated that a significant amount of time was needed to allow for completion of the detailed search of the vehicle and a detailed accounting of the contents and the issuance of the receipt for the found currency.  It is also possible that additional time was also utilized in an effort to discover more contraband than the "fleck" of marijuana that had been found during the search.

The record does not indicate that Vigna and Curtis were Mirandized at the site of the stop or at any time prior to their arrival at the X-press garage,  but they were Mirandized at approximately 11:41 a.m. while at the garage, shortly after Trooper Romero and the mechanic determined that there was a hidden compartment with contents.

FBI Agent Meyer and/or Sgt. Schultz and/or Trooper Romero questioned Vigna and/or Curtis at the Trooper post after they were Mirandized and after Vigna requested an attorney.

An example of a traffic stop detention that exceeded its limitations and converted into a Fourth Amendment seizure is United States v. Blair, 524 F.3d 740, 752 (6th Cir. 2008), where the traffic stop commenced as a tag-light stop, the purpose of which  was fulfilled as soon as the officer obtained all the information necessary to write a citation for the violation and no proof of insurance. However, the officer returned to the defendant's vehicle two minutes later and informed the defendant that a dog would be called to the scene after the defendant refused to consent to the search.  The Sixth Circuit held that the remainder of the stop required reasonable suspicion to hold the defendant and was in violation of the Fourth Amendment.

48

Courts will address the question of whether a law enforcement office has effected a Fourth Amendment arrest where one or the other of two circumstances arises: (1) a detainee claims that an officer's investigatory stop was not supported by probable cause; or (2) the government claims that an officer's warrantless search meets the search-incident-to-arrest exception.  The Sixth Circuit has used the same criteria to analyze either circumstance.  See, e.g., United States v. Marxen, 410 F.3d 326, 332 (6th Cir. 2005) (proper application of the probable cause standard depends on a fact-specific analysis of the "measures utilized by the police"), and United States v. Hatfield, 815 F.2d 1068, 1070-71 (6th Cir. 1987) (the applicability of the search-incident-to-arrest exception depends on a fact-specific analysis of the degree of force the officer used).

There is no bright-line test for determining when an investigatory stop crosses the line and becomes an arrest. See, e.g., United States v. Lopez-Arias, 344 F.3d 623, 627-28 (6th Cir. 2003).  The analysis of the conditions and circumstances that rise to the level of arrest, or that lead from a detention to an arrest is a fact-sensitive inquiry, requiring assessment of the totality of the events.  Id.   In making this determination a court shall consider a variety of factors, including, but not limited to: (1) movement or  transportation of the detainee from the site of the initial stop or detention to another location, e.g., police station; (2) the nature and extent of the imposition of restraint or limitation on freedom of movement involving physical confinement or other coercion; (3) use of weapons or bodily force; and (4) issuance of Miranda warnings.  Id. See also United States v. Richardson, 949 F.2d 851, 857 (6th Cir. 1991)); United States v. Montgomery, 377 F3d 582, 588 (6th Cir. 2004) (holding that the reading of Miranda warnings is evidence of an arrest).  However, no single factor is ultimately dispositive of this issue, and the

49

court must look toward the whole of the events in question.

What constitutes a workable and precise definition of "arrest" seems to be a matter of some uncertainty. Some cases have equated the rule used to determine that an arrest had occurred with the rule traditionally used to define a Fourth Amendment seizure. See, e.g., United States v. Saari, 272 F.3d 804, 808 (6th Cir. 2001) (an arrest occurs when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave") (quoting United States v. Mendenhall, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980)). In other cases the Sixth Circuit has turned to the rule traditionally used to evaluate when a suspect is "in custody," pursuant to an analysis of the suspect's Fifth Amendment right, as articulated through Miranda. See, e.g., Houston v. Clark County Sheriff Deputy John Does 1-5, 174 F.3d 809, 823 (6th Cir. 1999) (arrest occurs when "a reasonable person in the suspect's position would have felt that he was under arrest or otherwise deprived of his freedom of action in any significant way") (internal citations and quotations omitted). The theme that binds these cases is that they draw upon a fact-specific analysis of the extent and nature of the force, or the image of force, imposed by the officers during the occasion in question.

In United States v. Everett, 601 F.3d 484 (6th Cir. 2010) the Sixth Circuit examined the law relating to prolongation of a traffic stop, stating,

> To qualify as reasonable seizures under the Fourth Amendment, Terry detentions must be "limited in [both] scope and duration." Florida v. Royer, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229, . . . (1983); see also United States v. Hensley, 469 U.S. 221, 235, 105 S. Ct. 675, 83 L. Ed. 2d 604 . . . (1985) (stating that "length and intrusiveness" of a stop are relevant to Terry analysis). Under Terry's duration prong, a stop "must . . . last no longer than is necessary to effectuate the purpose of the stop." Royer, 460 U.S. at 500. Under its scope prong, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of

50

time." <u>Ibid</u>.; <u>see also</u> <u>United States v. Sharpe</u>, 470 U.S. 675, 682, 105 S. Ct. 1568, 84 L. Ed. 2d 605 . . . (1985) (stating that stop must be "reasonably related in scope to the circumstances which justified the interference in the first place").

<u>Everett</u> at 488-89.  "[A]n officer can lawfully detain the driver of a vehicle until after the officer has finished making record radio checks and issuing a citation, because this activity 'would be well within the bounds of the initial stop.'" <u>United States v. Wellman</u>, 185 F.3d 651, 656 (6th Cir. 1999) (further citations omitted). <u>See also</u> <u>United States v. Lopez-Urquiza</u>,  2011 U.S. Dist. LEXIS 51786, (E.D. Tenn, March 14, 2011), <u>accepted by</u>, <u>in part</u>, <u>adopted by</u>, <u>in part</u>, <u>motion denied by</u> <u>United States v. Lopez-Urquiza</u>, 2011 U.S. Dist. LEXIS 51810, (E.D. Tenn., May 13, 2011).

The Sixth Circuit has held that an officer's reasonable suspicion justifies both further detention and brief questioning during the course of a traffic stop without it resulting in an arrest. <u>United States v. Palomino</u>, 100 F.3d 446, 450 (6th Cir. 1996). <u>See</u>, <u>also</u>, <u>United States v. Bradshaw</u>, 102 F.3d 204, 211-12 (6th Cir. 1996). (detention in patrol car while officer issued traffic citation did not constitute an arrest), <u>cert</u>. <u>denied</u>, 520 U.S. 1178, 117 S. Ct. 1453, 137 L. Ed. 2d 558 (1997); <u>United States v. Winfrey</u>, 915 F.2d 212, 216-17 (6th Cir. 1990) (15 minute detention for questioning by DEA agents permissible).

To emphasize that the arrest versus temporary detention calculus rests on an examination of the details of the interaction and requires a view of the totality of the circumstances the Sixth Circuit has held that even the use or display of force when making a Terry stop does not necessarily turn the stop into an arrest.  <u>See</u>, <u>e.g.</u>, <u>United States v. Hardnett</u>, 804 F.2d 353 (6th Cir. 1986) (officers ordering suspects out of a vehicle at gunpoint did not exceed bounds of permissible Terry stop), <u>cert</u>. <u>denied</u>, 479 U.S. 1097, 107 S. Ct. 1318, 94 L. Ed. 2d 171 (1987).

See also United States v. Garza, 10 F.3d 1241 (6 Cir. 1993) (same).

Police may detain a person based on probable cause to believe that person has violated a traffic law. United States v. Bradshaw, 102 F.3d 204, 210 (6th Cir. 1996) (where the officer has probable cause to believe that a traffic violation has occurred, the resultant stop is not unlawful and does not violate the Fourth Amendment); United States v. Ferguson, 8 F.3d 385, 391 (6th Cir. 1993) (traffic stop is reasonable where there is probable cause to believe a traffic violation occurred and whatever else the officer may have suspected about the driver is irrelevant).

"A traffic stop is analogous to a 'Terry stop' in that, following the initial stop, the subsequent detention cannot be excessively intrusive and must be reasonably related in time to the investigation." United States v. Wellman, 185 F.3d 651, 656 (6th Cir. 1999); see also, United States v. Wilson, 506 F.3d 488, 2007 WL 3131682, *3 (6th Cir. 2007) ("An ordinary traffic stop is like an investigative detention, the scope of which is governed by Terry [v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)] principles") (brackets added) (quoting United States v. Perez, 440 F.3d 363, 370 (6th Cir.2006)). "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." United States v. Perez, 440 F.3d 363, 372 (6th Cir.2006) (quoting Florida v. Royer, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983)). "The investigative means used should be the least intrusive means reasonably available to verify or dispel the officer's suspicions in a short period of time." Perez, 440 F.3d at 372 (citing Royer, supra, 460 U.S. at 500). However, when the purpose of the traffic stop has been fulfilled, the officer may not continue to detain the vehicle or its occupants unless, during the stop, information comes to the officer's attention that supports reasonable suspicion sufficient to justify continued detention. United States v. Mesa, 62 F.3d

52

159, 162 (6th Cir. 1995); Perez, 440 F.3d at 370.

In the present case the Troopers' announced purpose for initiating the traffic stop of the Silverado was that they had observed three separate instances of the vehicle departing from its lane of travel and contacting or crossing the white line of the highway.  Also, the purpose of the questions the Troopers asked of driver Vigna and passenger Curtis was, in large measure, designed to elicit information that would allow the Troopers to determine what may have caused the lane violation and whether Vigna and Curtis were fit to continue their journey.  Thus, whatever other suspicions or hunches may have animated the Troopers' decision to initiate the stop of the Silverado, the basis of the decision to stop was governed by the observation of the lane change violation and other consideration directly related to the lane change violation.  This was the purpose of the stop.  Perez, supra.  Accordingly, such temporary, non-custodial detention and related inquiry as may have naturally emanated from the defining purpose of the stop was permissible and did not rise to the level of a Fourth Amendment protected seizure of the person or a Fifth Amendment protected interrogation.  Bradshaw, supra, 102 F.3d 204;  Wilson, supra, 506 F.3d 488.

However, in addition to stopping the vehicle for the lane change violation and questioning the Silverado's occupants on matters pertinent to the lane change violation and fitness to travel, i.e., questions concerning use of intoxicants, duration of travel, etc., the Troopers initiated a dog sniff.  As this Court has already addressed the question of what is required for initiating a dog sniff there is no need to undertake further examination of that issue here, other than to say that in the absence of any constitutional protections associated with initiating a dog sniff at a traffic stop the Troopers were free to do as they were inclined and to

53

undertake appropriate investigative action, including bringing Hans out, consistent with such suspicions or hunches as may have informed their initial decision to pursue the Silverado and that may have found further support in their initial, pre-sniff inspection of the vehicle.

Thus, the non-custodial traffic stop detention of Vigna and Curtis continued during the vehicle sniff by Hans.  However, at the terminus of the sniff of the Silverado, Hans gave what Trooper Romero regarded as a positive alert and, as discussed above, this event gave the Troopers the authority to search the Silverado for contraband consistent with what Hans had been trained to alert for.  At this point the texture and character of the detention of Vigna and Curtis changed or at least began to change, i.e., no longer was the purpose of detaining Vigna and Curtis defined primarily, if not exclusively, by the particulars of the traffic violation Vigna was deemed to have committed and such immediately related collateral considerations as may have reasonably arisen therefrom; but a new purpose had emerged, a purpose that extended beyond the confines of the initial justifying purpose of the traffic stop itself.

This new purpose was the search for contraband, contraband the existence of which was suggested by the positive alert of Hans, and the suspicion of which may have informed an underlying hunch of Troopers Romero and Arnold after they first observed the Silverado and subsequently followed it on the Ohio Turnpike.  Yet, as noted, this suspicion of contraband was not the justifiable basis of the traffic stop, rather,  the claimed lane violation was, and, as such, it is the purpose attendant to and arising out of the lane change violation that determines the framework within which the non-custodial detention versus arrest analysis must take place.

Arguably, for some period of time after the moment when Hans alerted, the condition of Vigna and Curtis's non-custodial detention may have continued.  However, at a certain point -

54

whether it was when Vigna and then, moments later, Curtis were removed from the Silverado, told to stand by the side of the highway, patted down and questioned about whether they had weapons on their person; or when they were placed in Sgt. Schultz's trooper vehicle; or when they continued to sit in Sgt. Schultz's vehicle while the roadside investigation of the interior and exterior of the Silverado was performed by Troopers Romero and Arnold and Sgt. Schultz; or when the decision was made to undertake further investigation and inspection of the Silverado and it, along with Vigna and Curtis, were transported to the X-press garage; or when Vigna and Curtis arrived at the X-press garage; or when other law enforcement personnel arrived at the X–press garage to join in the investigation of the Silverado; or at approximately 11:41 a.m. when Trooper Romero and/or Sgt. Schultz approached Vigna and Curtis and told them what they had thus far observed in their inspection of the vehicle and read Vigna and Curtis their Miranda warnings - Vigna and Curtis were no longer under a non-custodial detention pursuant to a lawful traffic stop, they were under arrest.

Clearly, at no point during this series of events were Vigna or Curtis free to leave and, clearly, no reasonable person would have felt free to leave under the circumstances. Moreover, although guns may not have been drawn, the presence of at first two, then three, then, eventually, a total of five or six law enforcement officers was a manifest expression of law enforcement presence and a sufficiently powerful statement of police force that would convey the impression of custodial status to a reasonable person in Vigna's or Curtis's position. Accordingly, this Court finds that the lawful non-custodial, temporary traffic stop detention of Vigna and Curtis transformed into a Fourth and Fifth Amendment protected seizure of the person, i.e., arrest, at some point during the approximately thirty-eight minute time period between Hans positively

alerting at the Silverado and 11:41 a.m., when law enforecement read Vigna and Curtis their Miranda rights at the X-press garage.

### F.  Effect of Arrest, Mirandization and Vigna's Request for Counsel Upon Subsequent Communications Between Law enforcement and Vigna or Curtis

The Fifth Amendment requires Miranda warnings be given where a person is subject to custodial interrogation.  Dickerson v. United States, 530 U.S. 428, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000); Oregon v. Mathiason, 429 U.S. 492, 494, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977). Statements made by a suspect while in custody must be preceded by Miranda warnings in order for those statements to be admissible.  United States v. Crowder, 62 F.3d 782, 785 (6th Cir. 1995).

Miranda warnings are required when a subject is questioned while in custody or the functional equivalent of custody.  Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).  To determine whether a suspect's freedom of movement has been limited to a degree that requires the reading of Miranda warnings, courts will look to the totality of circumstances and ask whether the "suspect's freedom of action is curtailed to a degree associated with formal arrest."  Berkemer v. McCarty, 468 U.S. 420, 440, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984).  For example, no arrest has occurred and, thus Miranda warnings are not required, where a suspect is questioned outside in a public place and is told by the police that he is not under arrest.  Such conditions weigh in favor of temporary detention as a non-custodial interrogation. United States v. Swanson, 341 F.3d 524, 529-31 (6 Cir. 2003).

The test for determining when a custodial detention, seizure of the person or arrest has occurred for purposes of the Fourth Amendment and when same has occurred for purposes of the Fifth Amendment are not identical.  Berkemer v. McCarty, 468 U.S. 420, 436- 41, 104 S. Ct.

56

3138, 82 L. Ed. 2d 317 (1984); <u>United States v. Salvo</u>, 133 F.3d 943, 949 (6th Cir. 1998); <u>accord</u> <u>United States v. Knox</u>, 839 F.2d 285, 289-291 (6th Cir. 1988). Under the Fourth Amendment, the test for determining whether a seizure of the person  has occurred is whether a reasonable person in the defendant's position would have felt free to leave, given the totality of the circumstances.   Whereas, for Fifth Amendment purposes, however, "the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  <u>Stansbury v. California</u>, 511 U.S. 318, 322, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994) (<u>per</u> <u>curiam</u>); <u>see</u> <u>also</u> <u>Miranda v. Arizona</u>, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) (custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.").  <u>See also</u> <u>United States v. Crossley</u>, 224 F.3d 847, 861 (6th Cir. 2000).

Given this distinction in Fourth Amendment and Fifth Amendment treatment of the meaning and indicia of custody and/or arrest it is, thus, possible for a person to be detained in Fourth Amendment terms but not in custody for purposes of requiring Miranda rights under the Fifth Amendment.   <u>Berkemer v. McCarty</u>, <u>supra</u>, 468 U.S. 420, 427.

Additionally, the issue of whether a defendant/arrestee has invoked his right to counsel and, on that basis, further questioning by law enforcement should have ceased is set forth below.

> After a knowing and voluntary waiver of rights under <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, law enforcement officers may continue questioning until and unless a suspect clearly requests an attorney. A suspect is entitled to the assistance of counsel during custodial interrogation even though the Constitution does not provide for such assistance. <u>Id</u>., at 469-473, 86 S.Ct., at 1625-1627. If the suspect invokes that right at any time, the police must immediately cease questioning him until an attorney is present. <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-485, 101 S.Ct. 1880, 1884-1885, 68 L.Ed.2d 378. The Edwards rule serves the prophylactic purpose of preventing officers

from badgering a suspect into waiving his previously asserted Miranda rights, and its applicability requires courts to determine whether the accused actually invoked his right to counsel. This is an objective inquiry, requiring some statement that can reasonably be construed to be an expression of a desire for an attorney's assistance. However, if a reference is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, Edwards does not require that officers stop questioning a suspect. Extending Edwards to create such a requirement would transform the Miranda safeguards into wholly irrational obstacles to legitimate investigative activity by needlessly preventing the police from questioning a suspect in the absence of an attorney, even if the suspect does not wish to have one present. The Edwards rule provides a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information. This clarity and ease of application would be lost if officers were required to cease questioning based on an ambiguous or equivocal reference to an attorney, since they would be forced to make difficult judgment calls about what the suspect wants, with the threat of suppression if they guess wrong. While it will often be good police practice for officers to clarify whether a suspect making an ambiguous statement really wants an attorney, they are not required to ask clarifying questions.

Davis v. United States, 512 U.S. 452, at 452, 453, 114 S. Ct. 2350 at 2352; Colorado v.Connelly, 479 U.S. 157, 168 (1986).  See also United States v. Lopez-Urquiza, supra,  2011 U.S. Dist. LEXIS 51786, *26-*28.

In the current case it is the view of this Court that Vigna and Curtis were subject to custodial detention and, thus, under arrest, from both the Fourth as well as the Fifth Amendment perspectives, at some point between the time that Hans positively alerted at the Silverado and the moment that Trooper Romero and/or Sgt. Schultz advised Vigna and Curtis of their Miranda rights.  That they were under arrest from a Miranda perspective at this time did not, however, preclude law enforcement from continuing to question them.

However, later in the afternoon, after Vigna and Curtis were first Mirandized at 11:41 a.m., and subsequent to the final opening of the hidden compartment by the X-press garage mechanic, and after Trooper Romero and/or Sgt. Schultz returned the second time to Vigna and

Curtis and told them what had been found, when Vigna asserted a claim of ownership as to the discovered currency and asked for an attorney, all further questioning by law enforcement should have ceased.

Accordingly, Miranda, or at least different aspects of Miranda, attached at two distinct points in this case: (1) at the moment the non-custodial traffic stop temporary detention transformed into an arrest (sometime between Hans's alert and the initial reading of Miranda rights at the X-press garage); and (2) later at the X-press garage after Trooper Romero advised Vigna and Curtis about the discovered currency and Vigna requested counsel.  The difference between the two is that, at least in theory, even though technically subject to custodial detention/arrest at some point after Hans alerted and up to the point when Vigna requested counsel, law enforcement was not prohibited from questioning Vigna and/or Curtis and any statements made by them could, arguably, be deemed to have been made in accordance with Vigna and/or Curtis having waived their Miranda protections.  By contrast from the point where Vigna requested an attorney, law enforcement should have ceased any further questioning of both Vigna and Curtis and, thus, any statements made by either Vigna or Curtis after this point would be less likely deemed to have been made subject to a waiver of their Miranda rights.

The Government has not, however, disclosed much, if any, information about either what questions law enforcement posed to Vigna and/or Curtis or what statements Vigna and/or Curtis may have made to law enforcement, whether in response to law enforcement queries or otherwise, after the point where Vigna and Curtis were instructed to exit the Silverado and enter Sgt. Schultz's trooper vehicle.  The most that the Government has indicated regarding such communications is that at 11:41 a.m. Vigna and Curtis indicated they understood their Miranda

rights and later, when told about the discovery of the currency, Vigna asserted a claim to the currency and asked for an attorney.  In such a vacuum of information it is difficult for this Court to determine such subtleties of communication and interaction as it might need to determine if Vigna and or Curtis knowingly and consciously waived their Miranda rights.  Indeed, Plaintiff has not argued that Vigna and/or Curtis waived their Miranda rights since Plaintiff  has consistently proclaimed that the whole eleven hour period from the point at which the Silverado was stopped to the time that Vigna and Curtis left the Trooper station was merely a temporary, albeit extended, but nonetheless temporary non-custodial traffic stop detention as to which no reading of Miranda was required.

With this in mind, the Court finds that Vigna and Curtis were subject to a Fifth Amendment custodial detention/arrest from the point at which they were ordered to enter Sgt. Schultz's trooper vehicle.  Accordingly, both Vigna's and Curtis's Miranda rights attached at this point.  The Court further finds that from this point until they were released at 10.00 p.m. neither Vigna nor Curtis waived their Miranda protections.  Accordingly, any statements made by Vigna and/or Curtis from the point at which they were transported by Sgt. Schultz from the site of the traffic stop are ordered excluded as evidence from all subsequent proceedings in this case.


**VII.  Conclusion.**

For these reasons, the undersigned DENIES in part and GRANTS in part Claimant's Motion to Suppress.  Specifically the Court finds that Claimant's Silverado was observed to have violated § 4511.33 of the Ohio Revised Code and on that basis the Ohio State Highway Patrol

60

Troopers had probable cause to stop the vehicle.  The Court also finds that under the standard established by the Sixth Circuit in <u>Diaz</u> that K9 Hans and the K9 Hans/Trooper Romero team were trained and certified and, thus were a reliable detection dog team.  The Court  finds that Hans exhibited a <u>bona</u> <u>fide</u> positive alert pursuant to it's sniff of the Silverado.  Taking these two factors together, the Court finds that the positive alert of Hans and the reliability of the Romero/Hans team supplied probable cause for the subsequent search of the vehicle.  Finally, the Court finds that the non-custodial traffic stop detention of Claimant Vigna and passenger Curtis evolved into an arrest at the point when Vigna and Curtis were removed from the situs of the traffic stop by OSHP Sgt. Schultz and that any statements made by either Vigna or Curtis after that time are subject to the exclusionary rule and are hereby ORDERED suppressed from all further proceedings related to the instant forfeiture case.

IT IS SO ORDERED.

  _s/ *Vernelis K. Armstrong*_____
Vernelis K. Armstrong
United States Magistrate Judge

Date:  March 2, 2012

## ADDENDUM

"Nothing but love has made the dog lose his wild freedom, to become the servant of man."  D.H. Lawrence.  "To his dog, every man is Napoleon; hence the constant popularity of dogs."  Aldous Huxley.  "The world was conquered through the understanding of dogs; the world exists through the understanding of dogs."  Nietzche.  "All knowledge, the totality of all questions and all answers is contained in the dog."  Kafka.

"This soldier, I realized, must have had friends at home and in his regiment; yet he lay there deserted by all except his dog. I looked on, unmoved, at battles which decided the future of nations. Tearless, I had given orders which brought death to thousands. Yet here I was stirred, profoundly stirred, stirred to tears. And by what? By the grief of one dog."  Napoleon Bonaparte, on finding a dog beside the body of his dead master, licking his face and howling, on a moonlit field after a battle. Napoleon was haunted by this scene until his own death.

The relationship between man and dogs reaches into depths of human history.  Dogs have

been used to serve human beings in a wide variety of endeavors for  for thousands of years.

Dogs were first domesticated somewhere between 15,000 to 20,000 years ago and were initially used for hunting, hauling, and guarding camps and settlements. At some point, imperialistic and class-based societies began to exploit dogs' aggressive potential for both offensive purposes (military dogs) and for internal social control, particularly to control slaves and to guard accumulated property. By the 5th century B.C., various societies had adopted these strategies. According to Michael G. Lemish, "Persians, Greeks, Assyrians and Babylonians all recognized the tactical advantage of war dogs and deployed them as forward attacking elements" (War Dogs).  http://www.oocities.org/ericsquire/articles/dogshist.htm

Dog history is really the history of the partnership between dogs (Canis lupus familiaris) and humans. That partnership is based on human needs for help with herding and hunting, an early alarm system, and a source of food in addition to the companionship many of us today know and love. Dogs get companionship,

> protection and shelter, and a reliable food source out of the deal.
> But when this partnership first occurred is at the moment under
> some controversy.
> http://archaeology.about.com/od/domestications/qt/dogs.htm

For many centuries dogs were used by English constabularies to assist in police work.

> Documented evidence exists from the Middle Ages showing that
> money was set aside in towns and villages to pay for the upkeep of
> bloodhounds to be used by parish constables to track down outlaws
> and criminals. In fact, during the reign of King Henry I, documents
> showing the staffing levels of the Royal Palaces refer to the
> appointment of a constable who, with the aid of a marshal, 'shall
> maintain the stables, kennels and mews, and be responsible for
> protecting and policing the whole  court'.
> http://en.wikipedia.org/wiki/Police_dog

It is this antiquity of the relationship between man and dog that informs and determines the ease with which we accept the use of dogs as a tool in law enforcement and criminal investigation.  The many and varied applications which man has found for the service of the dog is an example of human technology, albeit ancient human technology, that has its origins deep in our shared past.  However, it is this same ancient relationship that may limit our willingness to evaluate this technology with the same rigor that we judge other, more contemporary technologies when used by law enforcement in ways that affect significant constitutional guarantees.

The precedent established by the Sixth Circuit in <u>Diaz</u>, <u>supra</u>, compels the Court's finding in this case on the matter of the reliability of K9 Hans and, thus, the sufficiency of probable cause for the search of Claimant's vehicle.  Yet, in some respects this is a troubling result.

This case begs the nagging question regarding what it was to which the dog was

63

responding when it exhibited alert behavior.  Admittedly, in the instant case, this post facto consideration is not apposite to the question of the Fourth Amendment sufficiency of the dog sniff as a platform for finding probable cause under current law.  That is, once the dog alerts the probable cause justification for the vehicle search is satisfied, and the fact that the subsequent search uncovers no contraband (that the dog has been trained to detect) is irrelevant to the probable cause issue and represents no more than a disconcerting footnote to the decisional matters of the case.

In the current case, despite the discovery of the hidden compartment underneath the truck bed of the Silverado and the presence of Defendant currency wrapped in 18 separate food saver bags and the subsequent identification of a mere "fleck" of marijuana by forensic examiners, the simple fact remains that, for want of a better term, Hans's sniff found no "tangible substance" for which Hans was trained to alert.   Indeed, the Government's expert essentially concedes this when he stated, in response to questioning regarding his opinion of what it was that Hans had alerted to, that it would only be a guess.

It is also perplexing that the default response to the determination that no "tangible substance" was found, is that the dog was reacting to a "residual" odor.  Consistent with this explanation, is that the hypothetical "residual" odor, must be a present time manifestation of "tangible substance" having been in the vehicle in the past.  This sort of rationale is, of course, problematic in that it assumes that the dog's "alert" could only have been to a residual aroma of a contraband that it was trained to detect.  This rationale then compels the hypothetical conclusion (i.e that "tangible substance" is there, or, at least, was there) despite the fact that (except for the dog's behavior) there is no other evidence of  "tangible substance" to be found.

This logic of the foregoing relies upon a curious and, from the perspective of the Fourth Amendment, unsettling predicate: that the dog is never wrong.  Since the dog is not trained to alert to "tangible substance" per se but to odors, or, more precisely, the molecular components that such "tangible substance" may release or emit into the immediate environment where such "tangible substance" is or was, the fact that no "tangible substance" is found does not necessarily void or contradict the assumption upon which basis the alert is presumed to have occurred. Accordingly, if a search uncovers no "tangible substance," it means only that the dog alerted to a minuscule chemical residue, which, though undetectable by man, was nonetheless sensed and responded to by the trained dog.  Indeed, consistent with this "infallible dog" rationale, one would pose the rhetorical response "What else could the dog have responded to?" and reasonably expect an answer of only silence.

We are left with an empirical proposition (i.e., contraband "tangible substance" is, or was, here) that can never be falsified but only confirmed.  The cognitive/sensory foundation (i.e., the dog's olfactory experience) that leads to the presumed empirical fact (i.e., the presence of contraband) is communicated to those who cannot share that cognitive/sensory experience  (i.e., dull nosed human beings) by certain humanly observable dog behaviors (i.e. the alert).  The questionable assumption that underlies this chain of reasoning is that the dog's alert behavior can never indicate anything other than the dog had a cognitive/sensory experience of the molecular presence of the contraband tangible substance to which he was trained to alert.  To put it simply, if the dog exhibits alert-like behavior it must have detected the aroma of contraband because nothing else in the dog's experience could possibly trigger such alert-like behavior.  The benefit of relying on this assumption is, of course, that it provides courts with an easy means to avoid

confronting the very real problem of the possibility and frequency of false positive alerts by detector dogs.  It is upon this questionable assumption that our Fourth Amendment protections seem to rest.

Recently, several state courts have taken a step beyond the shibboleth of the infallible dog and have challenged the assumption of dog reliability that has guided the courts at least since United States v. Place, supra.

In Harris v. Florida, 2011 Fla. Lexis 953, *43-*44 (S.Ct. Fla., April 21, 2011) (not final until time for rehearing, and if filed, determined). the Supreme Court of Florida issued an opinion that found a drug-detection dog's response insufficient to establish probable cause.  The Court in Harris  recognized several key problems with relying on dog alerts for probable cause to support searches or seizures protected under the  Fourth Amendment.  The Harris court examined numerous studies and addressed a variety of issues relevant to the question and applicability of the use of dog detection as a mechanism to facilitate governmental intrusion into a Fourth Amendment protected zone, including: (1) dog sniffs may be unreliable because dogs are easily distracted and are highly suggestible, (2) concern with dogs that have a history of false alerts; (3) the potential for handler error and cuing affecting a dog's accuracy (e.g., "if the handler believes that contraband is present, they may unwittingly cue the dog to alert regardless of the actual presence or absence of contraband" or "may consciously cue their dog to alert to ratify a search they already want to conduct"); and (4) the potential for dogs to alert to residual odors due to hypersensitivity of a dog's nose, leading to a person and vehicle being subjected  to an invasive search when no contraband is actually present. Id. at *26-34. The Harris court took the position that, before a dog can be relied upon, the prosecution must produce evidence and

testimony so that a court may evaluate the dog's history of false alerts both in training as well as field deployment;  history of alerts to residual odors; training and certification records, including, an explanation of the meaning of the particular training and certification; evidence concerning the experience and training of the handler; and, any other objective evidence known about the dog's reliability, or lack thereof. Id. at *34-*35;  Even though the state produced a valid certification and showed a really good success rate during training, it failed to establish if it had any false alerts; the training records lacked necessary details, including, the location of the drugs and whether a variety of environments or distractions were used in training; it did not produce evidence setting forth the criteria for the dog's certification; it failed to present any quantification of this dog's success rate in the field because it did not introduce the dog's field records; similarly, it failed to present evidence regarding the dog's ability to detect residual odors, including, how the dog's alert to a residual odor on the door handle provided a fair probability that drugs would be found. Id. at *34-52;

In Oregon v. Helzer, 2011 Ore. Lexis 298 (No. SC S058001) (April 7, 2011) the Oregon Supreme Court held that the prosecution failed to carry its burden of showing that the dog's alert was a sufficiently reliable basis for a finding of probable cause.  The court found that records failed to show the training that the officer/handler received with respect to avoiding handler cues or other errors that could cause a dog to alert falsely.  The court also stated that field performance records were insufficient to establish the necessary quantum of reliability.  Despite the fact that field records as well as certification and training records were introduced, the Supreme Court of Oregon held that those records were inadequate to establish that the dog was sufficiently reliable to provide probable cause.  In Helzer  the dog's certification was provided

by a private organization whose training methods and standards were not established, and the training records failed to provide enough information about what training the officer had to avoid handler cues or other errors that could cause a dog to alert falsely.  See also State v. Gardner, 2011 Fla.App.Lexis 15717, *5-6 (October 5, 2011) (not final until time for rehearing expires) and Wiggs v. State, 2011 Fla.App.Lexis 12146, *7-17 (Aug. 3, 2011), reh'g denied, 2011 Fla.App.Lexis 18057 (2011) (although the State presented sufficient evidence of field and training, its failure to produce field records with a reasonable accuracy rate as it relates to residual odors resulted in a reversal of the denial of the suppression motion).

Some courts have utilized a  totality of the circumstances approach when determining a dog's reliability. For example, in State v. Nguyen, 2007 SD 4, 726 N.W.2d 871, 876-77 (S.D. 2007), the defendant argued that the dog's field activity report indicated that the dog was not sufficiently  reliable to meet the probable cause requirement.. The South Dakota Supreme Court stated that while the "apparently false indications [gave it] pause, . . . [it did] not believe these field reports should be relied on, standing alone, in measuring [the dog's] reliability." Id. at 877. The court offered the following explanation:

> In our view, trial courts making drug dog reliability determinations may consider variety of elements, including such matters as the dog's training and certification, its successes and failures in the field, and the experience and training of the officer handling the dog. Under the totality of the circumstances, the court can then weigh each of these factors.

Other courts have entertained the possibility that trial courts might consider multiple factors and have emphasized concern with the issue of false positive alerts by the dog.  For example, in State v. England, 19 S.W.3d 762, 768 (Tenn. 2000), the Tennessee Supreme Court refused to embrace the per se rule that probable cause is established through a positive alert by a

trained drug detection dog. The court stated that the analysis of probable cause should be based on the dog's reliability and that it was the trial court's responsibility to ensure that the dog is reliable by making factual findings. Id.  In setting forth a framework within which such reliability determination should be made the Tennessee Supreme Court stated:

> Accordingly, in our view, the trial court, in making the reliability determination may consider such factors as: the canine's training and the canine's "track record," with emphasis on the amount of false negatives and false positives the dog has furnished. The trial court should also consider the officer's training and experience with this particular canine.

Additionally, in United States v. Florez,, 871 F. Supp. 1411, 1420-21 (D.N.M. 1994), the United States District Court for the District of New Mexico took note of the fact that certified dogs have falsely alerted and held that the fact that a dog is certified was not, in an of itself, sufficient to establish probable cause.  Comparing the dog sniff to an informant's tip, the court offered the following probable cause analysis:

> In summary, where adequate and comprehensive records are maintained on a particular narcotics dog, and include results of controlled alerts made in training, as well as actual alerts in the field, the dog's reliability could be sufficiently established either through the records themselves or testimony from the dog's trainer who maintained the records. In this respect, the dog's alert is analogous to information provided by a reliable informant, and his alert without more could establish probable cause.
>
> However, where records are not kept or are insufficient to establish the dog's reliability, an alert by such a dog is much like hearsay from an anonymous informant, and corroboration is necessary to support the unproven reliability of the alerting dog and establish probable cause. To accept less would compromise the very principles that the requirement of probable cause was designed to protect.

Id. at 1424.

The New Mexico district court drew support for this approach from United States v. Nielsen, 9 F.3d 1487, 1491 (10th Cir. 1993), wherein the Tenth Circuit stated, "If this were a case

of an alert by a trained drug sniffing dog with a good record, we would not require corroboration to establish probable cause."   The significance of this holding is that it appears to provide that, if a court relies only on training and certification records per se but does not address other factors that are relevant to the dog's performance,  the court will not have an adequate understanding of the various circumstances that influence the reasonableness of the officer's belief in the dog's reliability and, thus, whether the dog's alert in a given circumstance actually indicates a fair probability that contraband was present inside a vehicle.

A similar view, i.e., that even a trained and certified dog does not, by itself, satisfy probable cause, was articulated by the dissent in  Illinois v. Caballes, supra,

> The infallible dog, however, is a creature of legal fiction. . . . [T]heir supposed infallibility is belied by judicial opinions describing well-trained animals sniffing and alerting with less than perfect accuracy, whether owing to errors by their handlers, the limitations of the dogs themselves, or even the pervasive contamination of currency by cocaine. [Cites cases]. In practical terms, the evidence is clear that the dog that alerts hundreds of times will be wrong dozens of times.

Caballes, 543 U.S. at 411-12 (Souter, J., dissenting).

Various treatises, law review articles and other studies have examined the various issues involved with the use of detector dogs and its implication in the areas of search and seizure, probable cause and the Fourth Amendment.  While it is considerably beyond the scope of this Memorandum Decision and Order to address these writings in detail, brief reference is warranted. See, for example:

*Courtroom Criminal Evidence*, Matthew Bender & Company, Inc. 1-18 Courtroom Criminal Evidence § 1821 Detection Dogs, Copyright 2011, (discussing the use of detection dogs to establish probable cause, analyzing various antecedent Fourth Amendment analogs supporting

the use of dogs that could affect the legal basis and justification for the use of the dog.)

Andy G. Rickman, *Note: Currency Contamination and Drug-Sniffing Canines: Should Any Evidentiary Value be Attached to a Dog's Alert on Cash?*, 85 Ky. L .J. 199, Fall, 1996-1997, (because much of the currency in circulation in the United States is contaminated with at least trace amounts of cocaine; a drug sniffing dog could alert on anyone carrying cash, thus no evidentiary value or Fourth Amendment significance should be accorded to a positive alert)

Robert C. Bird, *Article: An Examination of the Training and Reliability of the Narcotics Detection Dog.*, 85 Ky. L. J. 405, Winter, 1996-1997, (canine alerts have proven highly effective, with many dogs achieving a nearly perfect record of drug detection; article examines how much training is required to make a dog reliable, what skills does an effective handler need, how should a dog's performance and accuracy be evaluated, what are the optimum circumstances for a dog sniff and discusses methods to enhance reliability, emphasizes the importance of understanding the handler and the ways in which the handler's attitudes and behavior can affect dog response, undertakes a statistical analysis to help sharpen the focus of a dog sufficiency review, examines judicial standards for canine reliability, the article concludes by acknowledging the benefits of drug detector dogs to the investigation of drug crimes but, recognizes that sniffs often fail, and recommends methods for enhancing dog reliability and exhorts reviewing judges to establish useful and appropriate standards for dogs and handlers, suggesting that courts be wary of reported dog success rates and should require full data, including, failure data).

Jeffrey S. Weiner and Kimberly Horman, *Cover Story: Those Doggone Sniffs are Often Wrong: The Fourth Amendment Has Gone to the Dogs*, 30 Champion 12, April, 2006, (observes that unquestioned faith in the precision and noninvasiveness of the dog sniff and the accuracy of

the trained and certified detection dog underlies the view currently held by most courts that the de minimis assertion of trained and certified is all that is necessary for a finding of probable cause; agues that such a perspective violates the mandate that the judicial officer make an appropriately informed and independent assessment of the probable cause sufficiency of the dog and dog/handler team; proposes that the judicial officer be provided with relevant information regarding the dog's performance, both in the training and the field deployment environments, asserting that courts, generally, have an entrenched disinclination to look too far beyond the limited assertion that the dog is trained and certified)

Richard E. Myers II, *Article: Detector Dogs and Probable Cause*, 14 Geo. Mason L. Rev. 1, Fall, 2006,(arguing that an alert, well trained dog with an excellent track record cannot, by itself, constitute probable cause for a search, suggesting that judicial resistance to the application of statistical analysis and unwillingness to examine old technologies with the same rigor it examines the application of new technologies has detrimental consequences to a proper understanding of the use of detector dogs; argues that a preferable approach would require a positive dog alert plus additional evidence as the necessary threshold to permit Fourth Amendment protected searches, noting the various difficulties tht arise for courts when attempting to evaluate objectively the basis and accuracy of dog alerts)

Mark E. Smith, *The Thirteenth Annual Frankel Lecture: Comment: Going to the Dogs: Evaluating the Proper Standard for Narcotic Detector Dog Searches of Private Residences*, 48 Hous. L. Rev. 103, Symposium, 2009, (the author, a sixteen year law enforcement veteran, with more than six years as a narcotic detector dog handler, observes that alerts that do not result in discovery of drugs may be problematic to interpret due to factors like contamination, residual

odors and other issues;  the author concludes by noting that it has been assumed for a long time that drug detector dogs are reliable but that a closer look at what these dogs do and the numerous factors that influence performance is warranted, observing that the truer picture of a dog's reliability cannot be drawn without deployment records, training records and the nature and context of the dog's utilizations and stating that the certification process for drug detector dogs should be standardized and minimum training guidelines established to provide courts with a reliable context for evaluating dog performance)

Lisa Lit, Julie B. Schweitzer, Anita M. Oberbauer, *Handler Beliefs Affect Scent Detection Dog Outcomes*, (2010)  Anim. Cogn., DOI 10.1007/s10071-010-0373-2  Received: 30 March 2010 / Revised: 13 December 2010 / Accepted: 14 December 2010   This article was published with open access at Springerlink.com, published online 12 January, 2011   The aim of this study was to examine whether and how human/handler beliefs might affect detector dog alert outcomes in an applied environment.  The authors questioned whether the beliefs of dog handlers affected the handler/dog team performance.  The study was also designed to compare the relative significance of handler attitude versus dog conduct as factors that affected or influenced a handlers' beliefs. Eighteen drug and/or explosive detection dog/handler teams each completed two sets of four searches.  There was a total of 225 incorrect responses.  There were no differences in mean responses across the search scenarios, however, response patterns differed according to the search condition.  The authors concluded that the handlers' beliefs - that a valid scent was present at the marked locations - potentiated or influenced a handler identification of a dog's behavior as constituting a valid alert of a contraband scent.  The authors further concluded that handler belief,  more than dog behavior, affected the determination that an alert had occurred.

73

Finally the authors opined that this result confirms that handler beliefs affect outcomes of scent detection in dog deployments.

The foregoing suggests that the time may be right for a reevaluation of the proper training, certification, use and application of the dog sniff as a tool of law enforcement and as a means to enable intrusion into Fourth Amendment protected space.

74